2001 D.S.D. 3

Steven C. EMERY, Rocky Le Compte, and James Picotte, Plaintiffs,

v.

Roger HUNT, in his official capacity as Speaker of the South Dakota House of Representatives, et al., Defendants.

United States of America, Plaintiff,

v.

State of South Dakota, William J. Janklow, in his official capacity as Governor of the State of South Dakota, et al., Defendants.

Nos. CIV. 00–3008, CIV. 00–3015.

United States District Court, D. South Dakota, Central Division.

Feb. 1, 2001.

Patrick K. Duffy, Rapid City, Laughlin McDonald, Bryan L. Sells, American Civil Liberties Union Foundation, Atlanta, GA, for Plaintiffs.

Timothy M. Engel, May, Adam, Gerdes & Thompson, John P. Guhin, Sherri Sundem Wald, Attorney General's Office, Pierre, for Defendants.

## ORDER

KORNMANN, District Judge.

[¶ 1.] The remaining issues in this case involve questions with regard to the award of legal fees and costs. The Emery plaintiffs seek an award of fees of $194,678.75 and costs of $11,270.69. The Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, and the Voting Rights Act, 42 U.S.C. § 1973*l*(e), each provide that a federal court in an appropriate action "may allow the prevailing party . . . a reasonable attorney's fee." Courts construe these sections similarly. It must be remembered that it is Congress and not the courts who made the decision to impose lawyers' fees on the losing side in cases involving violations of civil rights and other limited types of cases. Congress decided that the prospect of such awards would discourage violations of the rights of our citizens and that the prospect of such awards would make it more likely that citizens would assert constitutional rights. Congress changed what we call the American-rule, a creature of the common law as decided by the courts, namely that each side is to, in general and with some exceptions, pay their own lawyers.

[¶ 2.] Before moving to a more substantive discussion of the claims and arguments of the parties, several observations must be made. I practiced law as a trial lawyer for approximately 30 years. While I represented many plaintiffs in all types of lawsuits, most based on a contingent fee basis, more of my practice consisted of insurance defense work. I represented a rather large number of insurance companies (or more accurately, their insureds) in South Dakota. I concluded my last jury case in state court the day before I took my present office on May 5, 1995. For 17 years, I did all the trial work for the City of Aberdeen, both in the trial courts and in the South Dakota Supreme Court. One memorable case involved the recovery of approximately $1,500,000.00 for Aberdeen ratepayers and customers of Northwestern Public Service Company. I appeared quite often before the South Dakota Supreme Court. I wrote my own briefs and argued my own cases. I believe I am very familiar with trial lawyers in general and what is required and not required to present a proper case. I was elected and served as president of the State Bar of South Dakota in 1988–89. I am an elected member of the American Board of Trial Advocates. I know personally almost all of the lawyers who regularly try cases in South Dakota. None of this makes any difference or has any importance except to make it clear that I do not approach the remaining issues in this case from an academic or abstract viewpoint.

[¶ 3.] Lawyers who become judges sometimes forget the practicing bar, what it was like to be on the other side of the bench, and the economics of the practice of law. Judges sometimes harken back to what we were charging in days past, forgetting that judges need not worry about overhead or billable hours. I hope that I will not be guilty of these sins, especially as I am further and further from the "real world."

[¶ 4.] Lawyers for time immemorial followed a practice of representing a client in a case from start to finish, with no other lawyer carrying the briefcase, doing the research or simply tagging along. I always followed that practice. I did all the work in each of my cases, unless it was an emergency of some kind and I was unavailable. If it was absolutely necessary for some other lawyer in my law firm to do something and to review the file to prepare, we certainly did not charge the client for any such duplication of services. In recent years, the practice of one lawyer representing the client has changed, although not by any means with all lawyers. I have seen and I continue to see two, three or more lawyers appearing at depositions, trials, and oral arguments, all representing the same party. Unless the client has insisted on such multiple appearances or the case is extremely complicated and protracted, I do not believe that such practices are, as a general proposition, in the best interests of the client. This is particularly the case in matters that are pre-trial. Certainly, there is great comfort in the trial lawyer having someone to talk to during trial, other than your opponent. There is comfort in having another lawyer take notes during voir dire or during direct or cross examination. There is comfort in trading off in the presentation of evidence and in cross examination. There is comfort in "kicking around a case" with other lawyers in your office and perhaps in having a more experienced lawyer read the brief. These, however, are luxuries largely for the benefit of the lawyers, not the client. In short, my general philosophy is:

if you cannot try a lawsuit yourself, then perhaps you should find another occupation. To be sure, no client should be subsidizing the education of a young lawyer. One of the Emery lawyers is just out of law school. He started practicing law in the year 2000. New lawyers oftentimes follow a senior partner to court and observe and even render some assistance. They often ask the more experienced lawyer what to do in a given case and that is all as it should be. The client, however, should not be responsible for any such activities. We all know that lawyers, like other professionals, have a great deal to learn upon graduating from school and entering the real world. We all know that it takes a lawyer a number of years to become efficient and to have a better idea when to stop beating a horse, whether the horse is healthy or ill or dead. Some lawyers, old or young, never learn that. We all know that new lawyers expend time that is not spent by more experienced lawyers. We know because we all did it in our early years of practice. Clients should also not be paying for basic knowledge and information that any lawyer is expected to know off-hand or learn on his or her own time and at her or his expense. Lawyers and judges should regularly read all decisions from the United States Supreme Court, from the applicable state supreme court or courts, from the applicable federal district courts and from the courts of appeal. They should also regularly read Law Week, advance sheets, session laws, law review articles, and many other publications. Again, this is simply a cost of doing business and the responsibilities of a professional. Lawyers also must be careful to use paralegals and secretaries to the fullest extent possible to hold down expenses for the client. Certainly, nothing should be billed to the client for secretarial work or for tasks that should be done by secretaries. Clients and not lawyers should benefit financially from macros, boilerplates, and the wonderful word processing tools we now have. Clients should

not be billed for what are simply overhead expenses incurred by any other business or profession.

[¶ 5.] I have no doubt that one of the attorneys for the Emery plaintiffs, Laughlin McDonald, can try virtually any lawsuit with no assistance from anyone and achieve good results. He is certainly one of the most outstanding voting rights attorneys in the United States. He has performed great public services to his country in representing many disadvantaged people over the course of his distinguished career. Counsel for plaintiffs were facing multiple attorneys from the South Dakota Attorney General's office. It is also true, however, that the United States Department of Justice and its attorneys were involved, having filed a similar case, although dealing only with the Voting Rights Act, which case was consolidated with the case brought by the Emery plaintiffs. It is also true that local counsel was required of the Emery plaintiffs. I reject out of hand any suggestion that Mr. Duffy spent too much time reviewing and checking what the *pro hac vice* attorneys did. I reject also any contention that he should not have spent time after the documents had already been submitted. Too many lawyers acting as local counsel spend too little time making sure that everything is being done properly by *pro hac vice* counsel. Finally, I fully recognize that, as a matter of law, it is not unreasonable for more than one lawyer or law firm to appear in a case or work on the case. Nor does that fact result in any reduction of fees to be awarded if the services are not duplicative and are necessary.

[¶ 6.] Mr. McDonald does not need any other lawyer, especially a very inexperienced lawyer, looking over his work. I would decline, in most cases, to charge fees to the losing side for one attorney supervising another attorney or checking the work of another attorney, other than what is required of local counsel when working with *pro hac vice* counsel. It may be that, in this case, counsel for the Emery plaintiffs did not divide their time appropriately. They may have performed duplicative work or spent many hours simply checking the other lawyer's work product. It is not necessary, however, to reach these issues in the present case, for reasons which will appear.

[¶ 7.] There is no doubt that the South Dakota Legislature should not have acted as they did to reapportion in "mid-stream", i.e. other than immediately after the federal census. They did so in the face of legal advice from the South Dakota Legislative Research Council that they could not legally do so. There is also no doubt that the defendants conceded nothing at any stage of this litigation and filed every conceivable motion (including some that were devoid of any legal merit) to attempt to defeat this case. Although I, in almost every case, do not follow a practice of becoming involved in settlement talk in lawsuits in my court, I did so in this case. I was concerned about the fast approaching primary and general elections and the great disruption that could be caused to candidates, public officials and voters, however I ruled. I urged the defendants to consider the mischief that could result from any court ruling that the legislature could reapportion, wholly or in part, in any given year. One political party could recapture control of the state legislature and then immediately undo what the other party had done in the regular reapportionment following the last census. Chaos could and probably would result. My prediction as to a final result turned out to be true when the South Dakota Supreme Court struck down what the legislature had done in "mid-stream." I also urged the parties to settle the case and simply agree that the 2000 election could proceed as scheduled with the "combined districts" with a commitment from the defendants and the legislative leadership that they would seek to convince the 2001 Legislature to again establish two districts. Plaintiffs readily agreed to this compromise. Defendants or those "calling the

shots" for the State would agree to nothing of the sort and, to my knowledge, never proposed any out-of-court resolution of this dispute. The Attorney General and his staff are often, like most lawyers, hired guns following directives from a client or clients. After all, it is the client's lawsuit, unless questions of professional ethics or illegal activities might be involved. I do not mean to suggest that either the Attorney General or his staff attorneys made the unwise decisions as to how to proceed here. I do not know who made them but the defendants took hard and fast positions throughout this lawsuit. In any event, the taxpayers of South Dakota will, of course, now pay for the reasonable legal expenses and costs of the plaintiffs, to the extent allowed by the court.

[¶ 8.] Other factors are significant. The case was never tried. After the preliminary matters were handled in federal court, it was simply briefed in the South Dakota Supreme Court. Counsel did not even orally argue the case before the South Dakota Supreme Court. The Supreme Court considered the matter on briefs on July 13, 2000, and the Supreme Court opinion was filed on July 26, 2000. The South Dakota Supreme Court acted in a most expeditious manner to try to accommodate the parties and the important issue presented. The issue before the South Dakota Supreme Court was not unusually complicated although I recognize that the defendants attempted to introduce arguments about federal law. The entire case, both in federal and in state court, was of very short duration. Nothing was ever decided about possible violations of the Voting Rights Act. There was no winner and no loser in that regard. There was nothing obtained in this case by way of a final solution. The South Dakota Legislature will in the 2001 session or a special session again reapportion the entire legislature. A majority of legislators in each body may decide to again establish a two member House district in the area in question and, if that is done, the plaintiffs will be back to "square one" with regard to the Voting Rights Act. Had this court ruled that there were violations of the Voting Rights Act, the South Dakota Legislature obviously would not have gone back in 2001 to take the same action already struck down. The Emery plaintiffs will not, however, be entirely back to "square one". They will be able to use all the legal research, pleadings and briefs, and discovery already on file in this case, if it becomes necessary to file another lawsuit in South Dakota with regard to the Voting Rights Act.

[¶ 9.] I reject the contention by the Emery plaintiffs that a competent lawyer could not have been obtained in South Dakota to file this lawsuit. First, there is nothing to indicate that the plaintiffs really looked for such a lawyer. Had they looked, they would have found one. Mr. Duffy is involved in this case. I have no doubt that he could have handled this case in a most competent manner. He suggests that it would be difficult for a sole practitioner such as he to represent the Emery plaintiffs on a contingent fee basis and that is true. There are nevertheless many lawyers who would have represented the Emery plaintiffs had they been approached. I reject the assertion that the Voting Rights Act law would be "beyond the scope" or the expertise of lawyers in South Dakota. Most trial lawyers in South Dakota do not have the luxury of being specialists. In the course of my own lawyering career, I represented seven different plaintiffs (one being a Native American) in medical negligence suits, all involving different medical issues. I dealt with cases involving fungicide labeling, cases involving claimed wrongful applications of chemicals, automobile accidents, product liability actions involving dozens and dozens of different products, utility rate law, a few criminal law cases, insurance policy interpretation cases, contract disputes, will contests, a few divorces, and virtually every other type of case other than patents or trademarks. These are all common practices for trial lawyers in South Dakota. I also,

like many other lawyers, engaged in estate planning work, probated estates, set up corporations and other business entities, and lobbied before the South Dakota legislature on many different issues. Before this case was filed, I certainly knew very little about the Voting Rights Act. I learned by doing research. Admittedly, it is easier for a judge to deal with new issues since the judge has the luxury of reading the research already done by the lawyers on both sides. I do not believe these issues are any more complicated than many issues presented in many other cases. This does not mean, of course, that specialists would not be much better prepared at the outset than general practice lawyers. Any general practice lawyer could and would work very hard to "get up to speed." I have knowledge that Mr. Duffy was heavily involved in a fossil dispute case. He would have known nothing about "fossil law" prior to becoming involved in that case. He learned, however, and his clients were certainly ably represented. I also reject the assertion that there is something undesirable about representing Native Americans. That belief may well be held by those in our state who are bigots and prejudiced but it is certainly not a general viewpoint. I believe, in the course of my practice, I represented more Native Americans in Aberdeen than any other attorney. I take note also that the Cheyenne River Sioux Tribe has four able and experienced lawyers on staff. Steven Emery is a graduate of Harvard University Law School and is well qualified. This particular tribe is well represented. Some of the best trial lawyers in our state have often stepped forward in the best tradition of the bar to represent people accused of heinous crimes, working for compensation that does not even cover overhead. Again, there is nothing to indicate that any South Dakota lawyer was approached and declined the representation. Mr. Duffy was not even contacted until after the ACLU had undertaken the representation. My experience teaches me that a number of excellent trial lawyers

regularly represent Indian Tribes and Native Americans in civil cases in federal court. These are desirable clients, not undesirable clients. Representation in one case often leads to further legal work for the lawyer. I further take note that there are a number of South Dakota Native American lawyers well qualified to handle virtually any trial in federal or state court.

■ [¶ 10.] The requested fees for a case of this type (involving all the issues) and the hours spent under South Dakota standards may well be shocking in amount. They may be clearly excessive under any standard. Attorney Richard Gregerson, a well respected member of the State Bar of South Dakota and the senior partner in one of the largest and most prestigious law firms in South Dakota, is of the opinion that they are. As one example, I am struck by the amount of time (approximately 260 hours) spent by Mr. McDonald's junior associate in dealing with claimed issues of judicial notice. Any lawyer would know that a judge may take judicial notice of certain things. He was researching whether a judge may take judicial notice of session laws and, in effect, statutes. Clearly, these are not matters of judicial notice. They deal with what is or was the law. As another example, he spent two hours researching the question of certification. That is simply time not spent productively. The procedure for a federal judge to certify something to the South Dakota Supreme Court is simple. The certification is made and they either accept it or they do not. There is nothing to research in that regard, especially if you are somewhat familiar with South Dakota law. The total time spent could well be clearly excessive even if submitted by an attorney who knew nothing about the Voting Rights Act and was starting from "ground zero." If I were to look at the claimed excessive time spent, I would look at the matter somewhat as though an attorney in my former law firm had come to me as a senior partner, asking "what do you think of this as a fee?" I sincerely

wonder if I could have retained consciousness at the mentioning of legal fees of nearly $195,000.00 and the case had never gone to trial. That would be assuming as a fact that I would have known little about the case. In the present case, I know a great deal. Were I to find that clearly excessive fees were being sought, I would normally be required to consider attorney fees awarded in similar cases. *See Thorne v. Welk Investment, Inc.*, 197 F.3d 1205 (8th Cir.1999). The Emery plaintiffs submitted a copy of a case decided by U.S. District Judge Patrick Michael Duffy of the District of South Carolina. I know Judge Duffy personally and he is an excellent judge. He awarded total fees and costs of $217,495.25 in a case in which Mr. McDonald was lead counsel for plaintiffs. That case had gone on for nearly a decade. The case had been before the district court, then to the United States Court of Appeals for the Fourth Circuit, and then back to district court. The result of the case was to strike down as unconstitutional the method of electing county legislative delegations in South Carolina. There are great differences between what happened in South Carolina and what happened in South Dakota. The cases are not similar in any event.

[¶ 11.] I would be unable, in any event, to look at "similar cases" because there is no similar case involving the completely separate questions of a provision of the state constitution such as we have here and the Voting Rights Act. The question of claimed excessive fees and the question of fees in similar cases would not, however, be reached unless I would first determine that the claims on which the Emery plaintiffs did not prevail and the claim on which they did prevail were so interrelated as to preclude a reduction in the fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The question of whether the "mid-stream" reapportionment was in violation of the South Dakota Constitution had absolutely nothing legally to do with questions under the Voting Rights Act. I find that the claims are not sufficiently interrelated. They do not involve a common core of facts or related legal issues under circumstances where the attorneys' time was devoted generally to the litigation as a whole. The fact that the legislature illegally and in violation of a portion of the South Dakota Constitution partially reapportioned in "mid-stream" is entirely separate in facts and in law from questions of Voting Rights Act violations. I, therefore, do not reach the question of claimed excessive fees. If necessary, I will reach that issue on another day.

[¶ 12.] There is nothing mysterious about the computation of attorneys fees to be awarded under 42 U.S.C. § 1988. A court is to first multiply the number of hours reasonably spent times the appropriate hourly rate. This calculation produces the basic or "lodestar" figure, below which the fee award should not go. Judges are then to consider other relevant factors. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), cited with approval in *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876 (8th Cir. 1977), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). If the factors allow, the court may change and would usually increase the lodestar figure. The court may also increase the lodestar figure based on the public importance or other extraordinary feature of a case. *See Taylor v. Jones*, 653 F.2d 1193, 1206 (8th Cir.1981).

[¶ 13.] "In general, a reasonable hourly rate would be the ordinary fee 'for similar work in the community,' *Johnson v. Georgia Highway Express, Inc., supra*, 488 F.2d at 718. 'The term 'reasonable hourly rate' has been defined as the 'hourly amount' to which attorneys *in the area* would typically be entitled for a given type of work on the basis of an hourly rate of compensation.' ... This does not mean that out-of-town counsel must always be limited to local rates ... If 'a plaintiff can show he has been unable through diligent,

good faith efforts to retain local counsel, attorney's fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried.' *Donaldson v. O'Connor*, 454 F.Supp. 311, 315 (N.D.Fla.1978)." *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 141 (8th Cir. 1982). As I have already found, the Emery plaintiffs have made no such showing and it is the finding of the court that they could make no such showing.

[¶ 14.] I find that the lodestar hourly rate for Messrs. McDonald and Duffy is $138.00 per hour. The lodestar rate for Mr. McDonald's junior associate is $125.00 per hour.

[¶ 15.] I must next consider the so-called *Johnson* factors. *See Johnson v. Georgia Highway Express Inc., supra*. This is despite the fact that " 'most, if not all, of the relevant factors' should be considered when setting the lodestar components. *Delaware Valley*, 478 U.S. at 565–66, 106 S.Ct. at 3089–99." *McDonald v. Armontrout*, 860 F.2d 1456, 1459 (8th Cir.1988).

 [¶ 16.] The *Johnson* factors are the time and labor expended, the novelty and difficulty of the questions raised, the skill required to properly perform the legal services rendered, the attorneys' opportunity costs in pressing the litigation, the customary fee for similar work, the attorneys' expectations at the start of the litigation, the time limitations imposed by the client or circumstances, the amount in controversy and the results obtained, the experience, reputation and ability of the attorneys, the undesirability of the case, the nature and length of the attorney-client relationship, and fee awards in similar cases. The United States Supreme Court case law is clear that the skill, experience, and reputation of counsel are key factors bearing on a rate's reasonableness. *See, e.g. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

[¶ 17.] I turn now to the factors in this case. (1) I will look at the time and labor expended only in the initial preparation stage of the entire lawsuit (as I find to be appropriate and reasonable) and then in connection with the victory that was obtained by plaintiffs. (2) While the question decided was somewhat novel, it was not difficult. (3) I do not find that any unusual skill would have been required to present the case to or to prevail in the South Dakota Supreme Court. (4) The "opportunity costs in pressing the litigation" are zero. Obviously, if a lawyer is working on a particular case, the lawyer is not working on another case at the same moment or hour and that is all that the Emery plaintiffs here present. That is not sufficient. (5) The customary fee will be that charged by competent and respected trial lawyers in South Dakota. (6) It is a factor that this case was handled on the basis of a contingent fee, thus presenting economic risks to the attorneys for the Emery plaintiffs. This justifies a somewhat higher overall fee since apparently there was no guarantee from the Cheyenne River Sioux Tribe of compensation for the attorneys. This deals with the *Johnson* factor of the attorneys' expectations at the start of the case. (7) I decline to award any additional fees because of the time constraints in this case. All such time constraints were self inflicted by the great delay in bringing this case. If anything, the fees should be reduced due to waiting until the last moment. (8) There was no "amount in controversy" and I have already discussed the limited results obtained. In addition, the Emery plaintiffs opposed the motion to certify the question to the South Dakota Supreme Court and did not prevail as to the ultimate remedy which I ordered following the ruling by the South Dakota Supreme Court. (9) As to the matter decided by the South Dakota Supreme Court, counsel for plaintiffs would have no better reputation than other trial lawyers regularly appearing before the court. They have no superior skills or experience in that regard. *Pro hac vice* counsel

would have been, in all probability, completely unknown to the South Dakota Supreme Court. Mr. McDonald's junior associate has much less experience and legal skills than South Dakota lawyers who regularly appear in court. He did not begin practicing law until January of 2000. Since the case was not orally argued, the Supreme Court would have had no opportunity to judge the oral advocacy skills of any of the out-of-state attorneys. (10) The case was not an undesirable case but was rather a case in which most competent lawyers could take pride in having participated and helping to establish an important legal principle in South Dakota. (11) The nature of the attorney-client relationship was limited apparently to this one case and was of very short duration. (12) There are no fee awards in cases that are similar.

■ [¶ 18.] Turning to the amount of the costs to be awarded, costs will be awarded in full as sought by Mr. Duffy with the exception of ordinary postage expenses. Routine and normal expenses for postage will not be allowed since that is a function of normal office overhead. There is no showing that counsel in Rapid City routinely send copy requests for, e.g. copy jobs of more than 100 copies, to a copying service or that such an establishment is even available. Such award of costs to Mr. Duffy will therefore be $442.75. Such copying services are available in Atlanta and all copies as itemized by Mr. McDonald will be at $.10 per page. This is a reasonable rate, especially given the tremendous number of copies made by *pro hac vice* counsel. Awarding copy expenses for all the copies made (although many copies obviously had to do with issues as to which the Emery plaintiffs did not prevail) is more than generous. No costs will be awarded in connection with the bill submitted by Mr. McDonald's junior associate as I cannot determine what purpose the copies or the other cost items served. All these costs of Mr. McDonald's junior associate appear to be almost exclusively in

connection with the requests for judicial notice and I am awarding nothing for such activities. All telephone expenses ($91.38) claimed by Mr. McDonald will be awarded. Expert witness fees and services will not be allowed. It is not permissible to "convert" a paralegal to an expert or *vice versa*. No expert testified to anything. Other expenses should be awarded for costs incurred in the year 2000, namely on February 9 and 10, June 2 and 9, July 29, and August 1 and 7 ($14.04 only). Total costs of $1,614.18 for telephone, copying and other expenses should be awarded to Mr. McDonald.

■ [¶ 19.] Turning to legal fees, while an award of $135 per hour would be appropriate, I find that $150.00 per hour is appropriate for Messrs. Duffy and McDonald, given the *Johnson* factors and the importance of this case under South Dakota law. Mr. Duffy had no choice under local rules other than to look carefully at everything presented by the other attorneys. It would be grossly unfair to not compensate him accordingly. Nothing will be awarded for the preparation of the billings. That is a clerical function and a function of normal overhead. No client would ever be charged for such expenses and neither will the defendants in this case. Mr. Duffy has not sought to be paid for any such items. He has presented total hours of 21.79. At $150.00 per hour, this is $3,268.50 and he will be awarded such amount.

■ [¶ 20.] This court certified to the South Dakota Supreme Court the constitutional issue under the South Dakota Constitution and the Supreme Court acted in a most expeditious manner. Counsel for the Emery plaintiffs, by initially raising the issue under the South Dakota Constitution and prevailing on that issue, "shot down" their own opportunities to possibly prevail on the Voting Rights Act issues and thus receive a larger fee. Counsel should be commended for raising the issue which was not raised by the Department of Justice. This court does commend them. It

must also be said, however, that counsel for the Emery plaintiffs unsuccessfully resisted the motion of the defendants to certify the question under the South Dakota Constitution to the South Dakota Supreme Court. They certainly would not be entitled to any fees in connection with that opposition. They are also not entitled to any fees for the dispute over the remedy to be ordered by this court. They did not prevail in that regard.

[¶ 21.] Fees for Mr. McDonald's junior associate will be awarded at $125.00 per hour for 79.2 hours. This is arrived at by first "allowing" 86.1 hours and discounting the same at 8% as Mr. McDonald's junior associate himself did in his billing. A discount of 8% translates to 6.9 hours. This produces a figure of $9,900.00. The 86.1 hours includes services rendered in the year 2000 on March 8 (2.6 hours only), 9, 10, and 27, April 20 (0.3, 0.9, 0.7, and 0.2 only), and 24 (0.7 and 0.4 only), May 12 (4.6 hours only), 14, 15, 16 (1.2 and 4.1 only), 17 (0.2 only), 18 (0.5 and 0.3 only), and 25 (0.4 only), June 6 (8.2 only), 7, 8 (7.1 only), and 9, July 27 (0.2 only), August 8 (2.6 only), 9 (0.7 only), 11 (1.2 and 1.3 only), 14, 15, 16, 17, and 18 (0.2 only). I believe these are generous allowances under all the facts and circumstances.

[¶ 22.] Fees for Mr. McDonald will be awarded at $150.00 per hour for 122.49 hours for a total of $18,373.35. This includes services rendered in the year 1999 on September 30, October 12, 13, 18, and 29, November 9, 12, 15, 29, and 30, December 1 (3.25 hours only), and 6. This includes services rendered in the year 2000 on January 3, 4, 18, 24, 26, and 31, February 1, 2, 3, 4, 7, 9 (.5 only), 11, 14, 16, 22, and 25, March 3, 7, and 23, April 18, 19, 21, 24, 26, and 27, May 12, 14, 15, 17, 18, and 22, June 1, 5, 6, 7, 8, 9, and 13, July 25, 26, and 27, and August 7 (1.54 hours only), and 8. I believe this is a generous allowance and I have given the benefit of the doubt in all instances to the Emery plaintiffs.

[¶ 23.] I am using all the *Johnson* factors and taking into account the importance of this case in establishing South Dakota law as to reapportionment timing. This results in a total award of $33,598.78.

[¶ 24.] This matter has been delayed quite some time. The defendants have hired additional counsel in connection with the disputes as to fees and costs and have employed an expert witness to examine and express opinions as to the costs and fees. Justice demands that interest be paid on the amounts awarded. Interest shall be paid from August 24, 2000, the date that plaintiffs first filed for an award of costs and fees. Interest shall continue until the awards are paid, interest to be computed and paid pursuant to SDCL 21–1–13.1 at the category B rate set by the South Dakota Legislature, namely 10% per annum. The normal federal rate on judgments will not be applied since that would not be justice to do so.

[¶ 25.] Normally, all legal fees for services performed in the State of South Dakota are subject to sales taxes. Counsel for the Emery plaintiffs have not included in their requests any allowances to pay such taxes. It would be circuitous to order the State to first pay such taxes to counsel for the Emery plaintiffs and then collect them from the same attorneys. On the other hand, it would be a matter of injustice for the defendants or the State to later claim that such taxes are due and any such injustice will not be permitted.

[¶ 26.] No other fees or expenses will be allowed in the present action, unless I am directed to revisit this matter by higher authority. At least for the moment, this highly disagreeable work is finished on my part.

[¶ 27.] This court wishes to leave no uncertainty. If another lawsuit is filed on the Voting Rights Act issues because the South Dakota Legislature again establishes a two member House district in the affected counties as to which the present lawsuit was brought or if further issues

arise as to the Voting Rights Act in this particular area of South Dakota, and if the plaintiffs prevail on any such issues, this court will again look carefully at all legal expenses and costs reasonably incurred by the plaintiffs, including those items which have not been allowed in the present action. I do not mean, of course, to suggest in any way what the decision of the court would be or might be as to any such matters.

[¶ 28.] Now, therefore,

[¶ 29.] IT IS ORDERED, as follows:

1) Costs shall be paid by the State of South Dakota to Patrick Duffy in the amount of $442.75.

2) Costs shall be paid by State of South Dakota to Laughlin McDonald in the amount of $1,614.18.

3) Attorney fees shall be paid by the State of South Dakota to Laughlin McDonald in the amount of $18,373.35.

4) Attorney fees shall be paid by the State of South Dakota to Patrick Duffy in the amount of $3,268.50.

5) Attorney fees shall be paid by the State of South Dakota to Mr. McDonald's junior associate in the amount of $9,900.00. No costs shall be paid to him.

6) Interest shall be paid on all awards at 10% per annum from August 24, 2000, until paid.

7) No other costs shall be taxed by the clerk.

8) All other requests for attorney fees and expenses are denied, without prejudice, but only if another similar lawsuit is filed by counsel for the Emery plaintiffs following the 2001 reapportionment of what are now Legislative Districts 28A and 28B and if such action is decided in favor of such plaintiffs as a result of violations of the Voting Rights Act

9) All objections of the defendants are overruled, except as granted by virtue of this Order.

10) If the defendants or the State of South Dakota ever claim and establish that sales taxes are due on the fees herein awarded, sales taxes shall also be awarded to counsel for the Emery plaintiffs.