2002 D.S.D. 32

Steven C. EMERY, Rocky Le Compte, and James Picotte, Plaintiffs,

v.

Roger HUNT, in his official capacity as Speaker of the South Dakota House of Representatives, et al., Defendants.

United States of America, Plaintiff,

v.

State of South Dakota, William J. Janklow, in his official capacity as Governor of the State of South Dakota, et al., Defendants.

Nos. CIV. 00–3008, CIV. 00–3015.

United States District Court,
D. South Dakota,
Central Division.

Dec. 12, 2002.

Patrick K. Duffy, For Individual Plaintiffs, Rapid City, Laughlin McDonald, For Individual Plaintiffs, Bryan L. Sells, American Civil Liberties Union Foundation, Atlanta, GA, Bonnie P. Ulrich, For United States Of America, U.S. Attorneys Office, Sioux Falls, Joseph D. Rich, For United States of America, Christopher Coates, Bret R. Williams, U.S. Department Of Justice, Voting Section, Civil Rights Division, Bill Lann Lee, For United States of America, U.S. Department of Justice, Educational Opportunities Section, Washington, D.C., for Plaintiffs.

Timothy M. Engel, For the State Defendants, May, Adam, Gerdes & Thompson, John P. Guhin, For the State Defendants, Sherri Sundem Wald, Attorney General's Office, Pierre, Cheryl F. Laurenz Bogue, For Corson and Ziebach County Auditors, Dupree, Steven Lyle Aberle, For Dewey County Auditor, Timber Lake, for Defendants.

## ORDER

KORNMANN, District Judge.

[¶ 1] The remaining issues in this case involve questions with regard to the award of legal fees. The *Emery* plaintiffs ("plaintiffs") sought an award of fees of $194,678.75 and costs of $11,270.69. The Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, and the Voting Rights Act, 42 U.S.C. § 1973(e), each provide that a federal court in an appropriate action "may allow the prevailing party ... a reasonable attorney's fee." Courts construe these sections similarly. It must be remembered that it is Congress and not the courts who made the decision to impose lawyers' fees on the losing side in cases involving violations of civil rights and other limited types of cases. Congress decided that the prospect of such awards would discourage violations of the rights of our citizens and that the prospect of such

awards would make it more likely that citizens would assert constitutional rights. Congress changed what we call the American-rule, a creature of the common law as decided by the courts, namely that each side is to, in general and with some exceptions, pay their own lawyers.

[¶ 2] By a previous order (Doc. 131, 2001 D.S.D.3) dated January 31, 2001, I awarded total costs of $2,056.93 against the State of South Dakota ("State"), attorney fees to Laughlin McDonald of $18,373.35, attorney fees to Patrick Duffy of $3,268.50, and attorney fees to Bryan Sells of $9,900.00. These items total $33,598.78. Prejudgment interest at 10% per annum was ordered as well, to run from August 24, 2000, until paid. These items have been paid.

[¶ 3] The plaintiffs appealed and it was determined I had erred in not awarding sufficient attorney fees. *See Emery v. Hunt,* 272 F.3d 1042 (8th Cir.2001). The principal issue in that appeal was whether I erred in disallowing fees for counsel's work on the plaintiffs' unsuccessful federal claims. It is now established in this case that the plaintiffs' unsuccessful federal claims are "related" to the successful state law claim for purposes of an award of attorney fees. I have been directed to award reasonable fees for the time spent by counsel for plaintiffs (1) opposing the motions to dismiss made by the State, (2) unsuccessfully opposing the motion of the State for certification to the South Dakota Supreme Court, and (3) working on the remedial phase of the case. As noted by the Court of Appeals, the plaintiffs "failed to dissuade the district court from ordering a special primary election to determine which candidates would be on the ballot for the general election in November." By direction, I am to determine whether and to what extent the plaintiffs' failure on this issue changed the overall significance of their victory.

[¶ 4] No further issues remain as to costs not awarded, as to use of a reasonable hourly rate for similar work in the community where the case was litigated, as to denial of compensation for expert witness expenses, as to denial of compensation for ordinary office overhead items or items which should be performed by a secretary rather than a lawyer, and as to denial of compensation for submitting and compiling time records and billing records, also a matter of routine office overhead not to be charged to a client or to a responsible third party.

[¶ 5] Before moving to a more substantive discussion of the claims and arguments of the parties, I wish to repeat some observations I made previously. Prior to taking office in 1995, I practiced law as a trial lawyer for approximately 30 years. I was elected and served as president of the State Bar of South Dakota in 1988–89. I am an elected member of the American Board of Trial Advocates. I know a very large number of all the lawyers who regularly try cases in South Dakota. None of this makes any difference or has any importance except to make it clear that I did not and do not approach the issues in this case from an academic or abstract viewpoint.

[¶ 6] Lawyers who become judges sometimes forget the practicing bar, what it was like to be on the other side of the bench, and the economics of the practice of law. Judges sometimes harken back to what we were charging in days past, forgetting that judges need not worry about overhead or billable hours. I hope that I will not be guilty of these sins, especially as I am further and further from the "real world."

[¶ 7] Lawyers for time immemorial followed a practice of representing a client in a case from start to finish, with no other lawyer carrying the briefcase, doing the

research or simply tagging along. I always followed that practice. I did all the work in each of my cases, unless it was an emergency of some kind and I was unavailable. If it was absolutely necessary for some other lawyer in my law firm to do something and to review the file to prepare, we certainly did not charge the client for any such duplication of services. In recent years, the practice of one lawyer representing the client has changed, although not by any means with all lawyers. I have seen and I continue to see two, three or more lawyers appearing at depositions, trials, and oral arguments, all representing the same party. Unless the client has insisted on such multiple appearances or the case is extremely complicated and protracted, I do not believe that such practices are, as a general proposition, in the best interests of the client. This is particularly the case in matters that are pre-trial. Certainly, there is great comfort in the trial lawyer having someone to talk to during trial, other than your opponent. There is comfort in having another lawyer take notes during voir dire or during direct or cross examination. There is comfort in trading off in the presentation of evidence and in cross examination. There is comfort in "kicking around a case" with other lawyers in your office and perhaps in having a more experienced lawyer read the brief. These, however, are luxuries largely for the benefit of the lawyers, not the client. In short, my general philosophy is: if you cannot try a lawsuit yourself, then perhaps you should find another occupation. To be sure, no client should be subsidizing the education of a young lawyer. One of the *Emery* lawyers was just out of law school. He started practicing law in the year 2000. New lawyers oftentimes follow a senior partner to court and observe and even render some assistance. They often ask the more experienced lawyer what to do in a given case and that is all as it should be. The client, however, should not be responsible for any such activities. We all know that lawyers, like other professionals, have a great deal to learn upon graduating from school and entering the real world. We all know that it takes a lawyer a number of years to become efficient and to have a better idea when to not start or to stop beating a horse, whether the horse is healthy, ill or dead. Some lawyers, old or young, never learn that. We all know that new lawyers expend a great deal of time that is not spent by more experienced lawyers. We know because we all did it in our early years of practice. Clients should also not be paying for basic knowledge and information that any lawyer is expected to know off-hand or learn on his or her own time and at her or his expense. Lawyers and judges should, of course, regularly read all decisions from the United States Supreme Court, from the applicable state supreme court or courts, from the applicable federal district courts and from the courts of appeal. They should also regularly read Law Week, advance sheets, session laws, law review articles, and many other publications. Again, this is simply a cost of doing business and the responsibilities of a professional. Lawyers also must be careful to use paralegals and secretaries to the fullest extent possible to hold down expenses for the client. Certainly, nothing should be billed to the client for secretarial work or for tasks that should be done by secretaries. Clients and not lawyers should benefit financially from macros, boilerplates, and the wonderful word processing tools we now have. Clients should not be billed for what are simply overhead expenses incurred by any other business or profession.

[¶ 8] As I have observed previously, I have no doubt that one of the attorneys for the plaintiffs, Laughlin McDonald, can try virtually any lawsuit with no assistance from anyone and achieve good results. He

is certainly one of the most outstanding voting rights attorneys in the United States. He has performed great public services to his country in representing many disadvantaged people over the course of his distinguished career. Counsel for plaintiffs were facing multiple attorneys from the South Dakota Attorney General's office. It is also true, however, that the United States Department of Justice and its attorneys were involved, having filed a similar case, although dealing only with the Voting Rights Act, which case was consolidated with the case brought by the plaintiffs. It is also true that local counsel was required of the plaintiffs. I previously rejected out of hand any suggestion that Mr. Duffy as local counsel spent too much time reviewing and checking what the *pro hac vice* attorneys did. I rejected also any contention that he should not have spent time after the documents had already been submitted. Too many lawyers acting as local counsel spend too little time making sure that everything is being done properly by *pro hac vice* counsel. Finally, I fully recognize that, as a matter of law, it is not unreasonable for more than one lawyer or law firm to appear in a case or work on the case. Nor does that fact result in any reduction of fees to be awarded if the services are not duplicative and are necessary.

[¶ 9] Mr. McDonald does not need any other lawyer, especially a very inexperienced lawyer, looking over his work. I would decline, in most cases, to charge fees to the losing side for one attorney supervising another attorney or checking the work of another attorney, other than what is required of local counsel when working with *pro hac vice* counsel. I do not believe there would have been any need in this case to have the new law school graduate checking or revising the work done by Mr. McDonald. Thus, there

has been some duplication of services and efforts.

[¶ 10] As I observed previously, there is no doubt that the South Dakota Legislature should not have acted as they did to reapportion in "mid-stream", i.e. other than immediately after the federal census. They did so in the face of legal advice from the South Dakota Legislative Research Council that they could not legally do so. There is also no doubt that the defendants conceded nothing at any stage of this litigation and filed every conceivable motion (including some that were devoid of legal merit) to attempt to defeat this case. Although I, in almost every case, do not follow a practice of becoming involved in settlement talk in lawsuits in my court, I did so in this case. I was concerned about the then fast approaching primary and general elections and the great disruption that could be caused to candidates, public officials and voters, however I ruled. I urged the defendants to consider the mischief that could result from any court ruling that the legislature could reapportion, wholly or in part, in any given year. One political party could recapture control of the state legislature and then immediately undo what the other party had done in the regular reapportionment following the last census. Chaos could and probably would result. My prediction as to a final result turned out to be true when the South Dakota Supreme Court struck down what the legislature had done in "mid-stream." I also urged the parties to settle the case and simply agree that the 2000 election could proceed as scheduled with the "combined districts" with a commitment from the defendants and the legislative leadership that they would seek to convince the 2001 Legislature to again establish two districts. Plaintiffs readily agreed to this compromise. Defendants would agree to nothing of the sort and, to my knowledge, never proposed any out-of-court resolution

of this dispute. The Attorney General and his staff are often, like most lawyers, hired guns following the directives from a client or clients. After all, it is the client's lawsuit, unless questions of professional ethics or illegal activities might be involved. I do not mean to suggest that either the Attorney General or his staff attorneys made the unwise decisions as to how to proceed here. In any event, the taxpayers of South Dakota will, of course, now pay for the reasonable legal expenses and costs of the plaintiffs, to the extent allowed by the court.

[¶ 11] This case was never tried. After the preliminary matters were handled in federal court, it was simply briefed in the South Dakota Supreme Court. Counsel did not even orally argue the case before the South Dakota Supreme Court. The Supreme Court considered the matter on briefs on July 13, 2000, and the Supreme Court opinion was filed on July 26, 2000. The South Dakota Supreme Court acted in a most expeditious manner to try to accommodate the parties and the important issue presented. The issue before the South Dakota Supreme Court was not unusually complicated although I recognize that the defendants attempted to introduce arguments about federal law. The entire case, both in federal and in state court, was of very short duration. Nothing was ever decided about possible violations of the Voting Rights Act. There was no winner and no loser in that regard. There was nothing obtained in this case by way of a final solution. Nevertheless, I fully recognize that I erred previously in not awarding appropriate fees for the voting rights work.

[¶ 12] I still reject the contention by the plaintiffs that a competent lawyer could not have been obtained in South Dakota to file this lawsuit. First, there was nothing to indicate that the plaintiffs really looked for such a lawyer. Had they looked, they would have found one. Mr. Duffy is involved in this case. I have no doubt that he could have handled this case in a most competent manner. He suggests that it would be difficult for a sole practitioner such as he to represent the plaintiffs on a contingent fee basis and that is true. There are nevertheless many lawyers who would have represented the plaintiffs had they been approached. I still reject the assertion that the Voting Rights Act law would be "beyond the scope" or the expertise of lawyers in South Dakota. Most trial lawyers in South Dakota do not have the luxury of being specialists. They are often general practitioners who rapidly get "up to speed" in a particular lawsuit. Before this case was filed, I certainly knew very little about the Voting Rights Act. I learned by doing research. Admittedly, it is easier for a judge to deal with new issues since the judge has the luxury of reading the research already done by the lawyers on both sides. I do not believe the substantive issues were any more complicated than many issues presented in many other cases. This does not mean, of course, that specialists would not be much better prepared at the outset than general practice lawyers. I also continue to reject any assertion that there is something undesirable about representing Native Americans. That belief may well be held by those in our state who are bigots and prejudiced but it is certainly not a general viewpoint. Some of the best trial lawyers in our state have often stepped forward in the best tradition of the bar to represent people accused of heinous crimes, working for compensation that does not even cover overhead. Again, there is nothing to indicate that any South Dakota lawyer was approached and then declined the representation. Mr. Duffy was not even contacted until after the ACLU had undertaken the representation. My experience teaches me that a number of excellent trial

lawyers regularly represent Indian Tribes and Native Americans in civil cases in federal court. These are desirable clients, not undesirable clients. Representation in one case often leads to further legal work for the lawyer. I further take note that there are a number of South Dakota Native American lawyers well qualified to handle virtually any trial in federal or state court.

[¶ 13] The requested fees for a case of this type (involving all the issues) and the hours spent under South Dakota standards are shocking in amount. They are excessive under any standard. With excessive fees being sought, I am required to consider attorney fees awarded in similar cases, if any. *See Thorne v. Welk Investment, Inc.,* 197 F.3d 1205 (8th Cir.1999). The plaintiffs submitted a copy of a case decided by U.S. District Judge Patrick Michael Duffy of the District of South Carolina. Judge Duffy is an excellent judge. He awarded total fees and costs of $217,495.25 in a case in which Mr. McDonald was lead counsel for plaintiffs. That case had gone on for nearly a decade. The case had been before the district court, then to the United States Court of Appeals for the Fourth Circuit, and then back to district court. The result of the case was to strike down as unconstitutional the method of electing county legislative delegations in South Carolina. There are great differences between what happened in South Carolina and what happened in South Dakota. The cases are not at all similar.

[¶ 14] The question of claimed excessive fees must now be reached. This is so because the law of this case is that the claims on which the plaintiffs did not prevail and the claim on which they did prevail are so interrelated as to preclude a reduction in the fees. *See Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

[¶ 15] There is nothing mysterious about the computation of attorneys fees to be awarded under 42 U.S.C. § 1988. A court is to first multiply the number of hours reasonably spent times the appropriate hourly rate. This calculation produces the basic or "lodestar" figure, below which the fee award should not go. Judges are then to consider other relevant factors. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), cited with approval in *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876 (8th Cir. 1977), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). If the factors allow, the court may change and would usually increase the lodestar figure. The court may also increase the lodestar figure based on the public importance or other extraordinary feature of a case. *See Taylor v. Jones,* 653 F.2d 1193, 1206 (8th Cir.1981).

[¶ 16] "In general, a reasonable hourly rate would be the ordinary fee 'for similar work in the community,' *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 718 'The term 'reasonable hourly rate' has been defined as the 'hourly amount' to which attorneys *in the area* would typically be entitled for a given type of work on the basis of an hourly rate of compensation.' ... This does not mean that out-of-town counsel must always be limited to local rates ... If 'a plaintiff can show he has been unable through diligent, good faith efforts to retain local counsel, attorney's fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried.' *Donaldson v. O'Connor,* 454 F.Supp. 311, 315 (N.D.Fla.1978)." *Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 141 (8th Cir. 1982). As I previously found, the plaintiffs made no such showing and such ruling of the court was affirmed on appeal.

[¶ 17] I find again that the lodestar hourly rate for Mr. McDonald is $138.00 per hour. The lodestar rate for Mr. Sells is $125.00 per hour. Fees as to Mr. Duffy are no longer at issue.

[¶ 18] I must next again consider the so-called *Johnson* factors. *See Johnson v. Georgia Highway Express Inc., supra.* This is despite the fact that " 'most, if not all, of the relevant factors' should be considered when setting the lodestar components. *Delaware Valley,* 478 U.S. at 565–66, 106 S.Ct. at 3089–99." *McDonald v. Armontrout,* 860 F.2d 1456, 1459 (8th Cir. 1988).

[¶ 19] The *Johnson* factors are the time and labor expended, the novelty and difficulty of the questions raised, the skill required to properly perform the legal services rendered, the attorneys' opportunity costs in pressing the litigation, the customary fee for similar work, the attorneys' expectations at the start of the litigation, the time limitations imposed by the client or circumstances, the amount in controversy and the results obtained, the experience, reputation and ability of the attorneys, the undesirability of the case, the nature and length of the attorney-client relationship, and fee awards in similar cases. The United States Supreme Court case law is clear that the skill, experience, and reputation of counsel are key factors bearing on a rate's reasonableness. *See, e.g. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565–66, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

[¶ 20] I turn again to the factors in this case. (1) I must look at the time and labor expended in the entire lawsuit (as I find to be appropriate and reasonable). (2) While the question decided was somewhat novel, it was not difficult. (3) I do not find that any unusual skill would have been required to present the case or to prevail. (4) The "opportunity costs in pressing the litiga-

tion" are zero. Obviously, if a lawyer is working on a particular case, the lawyer is not working on another case at the same moment or hour and that is all that the plaintiffs here present. That is not sufficient. (5) As affirmed on appeal, the customary fee will be that charged by competent and respected trial lawyers in South Dakota. (6) It is a factor that this case was handled on the basis of a contingent fee, thus presenting economic risks to the attorneys for the plaintiffs. This justifies a somewhat higher overall fee since apparently there was no guarantee from the Cheyenne River Sioux Tribe of compensation for the attorneys. This deals with the *Johnson* factor of the attorneys' expectations at the start of the case. (7) I decline to award any additional fees because of the time constraints in this case. All such time constraints were self-inflicted by the great delay in bringing this case. If anything, the fees should be reduced due to waiting until the last moment. (8) There was no "amount in controversy." While the plaintiffs unsuccessfully opposed the motion to certify the state law question to the South Dakota Supreme Court, I have been directed to ignore that fact. As indicated, I have been directed to consider the effect of the plaintiffs not prevailing as to the ultimate remedy which I ordered following the ruling by the South Dakota Supreme Court. (9) Counsel for plaintiffs would have no better reputation than other highly experienced trial lawyers regularly appearing before the court. They have no superior skills or experience in that regard. *Pro hac vice* counsel would have been completely unknown to the South Dakota Supreme Court and were unknown to me. Mr. Sells has much less experience and legal skills than South Dakota lawyers who regularly appear in court. He did not begin practicing law until January of 2000. Since the case was not orally argued, there was no opportunity to judge the oral advo-

cacy skills of any of the out-of-state attorneys. (10) The case was not an undesirable case but was rather a case in which most competent lawyers could take pride in having participated and helping to establish an important legal principle in South Dakota. (11) The nature of the attorney-client relationship was limited apparently to this one case and was of very short duration. (12) There are no fee awards in cases that are similar.

[¶ 21] I have reexamined all billing records submitted. As to Laughlin McDonald, I award additional attorney fees of $45,360.00. This is based on 302.4 additional hours at $150.00 per hour. His lodestar rate is increased to $150.00 per hour based on the *Johnson* factors. Fees are allowed for time spent on November 17, 1999, December 2, 3, 7, 16, 17, and 23 of 1999, January 11, 12, and 25 of 2000, February 9, 17, and 18, March 8, 10, 13, 14, 17, 21, 22, 24, 27, 28, 29, and 30, April 3, 4, 7, 8, 10, 11, 12, 13, 20, 25, 27 and 28, May 1, 2, 3, 4, 9, 10, 11, 12, 16, and 25, June 2, 12, 14, 15, 19, 20, 27, 28, 29, and 30, July 1, 3, 5, 6, 7, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, and 31, and August 1, 2, 3, 4, and 7. I disallow .5 hours on November 17, 1999, .5 hours each on December 2 and 3, 1999, .5 hours on February 9, 2000, 2.75 hours on February 29, .3 hours on March 13, all as constituting work that should be performed by a secretary. I disallow .85 hours on March 10, and 1 hour on March 14, both as involving one attorney in the same "firm" talking to another.

[¶ 22] I exercise my discretion to not disallow fees based on the opposition of plaintiffs to the remedy finally adopted by the court.

[¶ 23] I turn now to the time records of Bryan L. Sells. Mr. Sells spent 260.4 hours researching and compiling documents as to "judicial notice." Of this, a great deal of time (65.4 hours) was spent preparing to ask the court to take judicial notice of South Dakota session laws, South Dakota Attorney General opinions, federal statutes, law review articles, and South Dakota statutes, none of which have anything to do with judicial notice. Any lawyer in South Dakota has immediate access to all session laws since statehood. Mr. Sells spent .9 hours attempting to locate session laws from the 1940's. Any South Dakota lawyer would have walked into the library and readily observed all such volumes. Any lawyer in South Dakota also has ready access to all South Dakota Attorney General opinions, no longer issued (for whatever value they might have), and, of course, an annotated code. Had an inquiry been made of local counsel, i.e. Mr. Duffy, these answers would have been immediately provided. Of course, the court would give consideration to such legal authorities. That is elementary. Judges do not take "judicial notice" of federal laws, domestic session laws, domestic statutes, law review articles, or similar legal authorities.

[¶ 24] In addition, it is common knowledge among South Dakota attorneys that the South Dakota Legislature has no legislative history, unlike the Congress and unlike more heavily populated states. It is elementary in South Dakota and under South Dakota law that no testimony as to legislative intent is permitted, even from the sponsor or sponsors of the legislation.

[¶ 25] At an hourly rate of $125.00, Mr. Sells would be asking for $32,550.00 for dealing with judicial notice. The very idea of judicial notice is not a complicated legal issue. The provisions of Fed.R.Evid. § 201 are not complicated. This is especially true when we are not dealing with a jury trial. In a trial to the court, trial judges routinely pay little, if any, attention to objections based on questions of relevancy. The reason is, of course, that the judge will not consider irrelevant material

when finally making a decision. It is not like a jury trial where the fear is that the bell cannot be "un-rung", so to speak.

[¶ 26] The requests made dealing with judicial notice are, very frankly, shocking. Based on the record before the court, they are unreasonable. They deal with legal concepts that are elementary and should be well known. No hearing was ever held pursuant to Fed.R.Evid. § 201(e).

[¶ 27] Mr. Sells also spent 99 hours indexing various documents (which includes the 65.4 hours spent on a claimed issue of judicial notice of session laws, statutes, law review articles, and attorney general opinions). Lawyers should not be indexing documents, especially documents as to which judicial notice does not possibly apply. Such tasks, if to be performed at all, should be part of normal office overhead and performed by secretaries or paralegals. Very little compensation will be awarded for any of the items discussed in the foregoing paragraphs.

[¶ 28] Mr. Sells also seeks to collect for time spent reading newspapers and a book, more than 10 hours. This is time that should be spent, if at all, by a secretary. Of course, any attorney should be reading the newspapers. I have never heard of a lawyer charging a client for time spent reading the newspapers or, for that matter, all the legal publications that every attorney should read regularly. No compensation will be awarded for any such time spent.

[¶ 29] Mr. Sells spent 86.2 hours working on the motion and brief as to the preliminary injunction. The court has previously allowed 2.6 and 1.4 hours of such hours spent. While this total amount of time would appear to the court to be excessive, an additional 75.62 hours (82.2 hours less the discount previously used of 8% (6.576 hours) for a total of 75.62 hours) will now be allowed which allowance will not be further detailed below.

[¶ 30] A great deal of unnecessary and excessive time was spent researching "certification". Again, that is a routine matter involving only SDCL Chapter 15–24A which consists of less than three pages. Either the South Dakota Supreme Court decides to allow the certification or they do not. Any South Dakota attorney would know that. There is virtually nothing to research, especially prior to the Supreme Court deciding what to do with the request. Very little time will be allowed for any such research.

[¶ 31] Additional hours as to Mr. Sells, before being discounted, will be allowed, as follows: 1.8 on January 4, 2000; as to March of 2000, .5 on March 14, 1.5 and .9 on March 17, 3.5 on March 20, 4.6 on March 21, 4.8 on March 22, 5 on March 23, 5.3 on March 24, 7.4 on March 27, 5.2 on March 28, 3.1 on March 29, 1 on March 30, and 2.7 on March 31; as to April of 2000, 1.5 on April 3, .1, .7, .6, .2, .4, and .2 on April 4, .1 on April 5, 1.3 and .7 on April 7, 3.2 on April 11, 7.3 on April 12, .2 on April 17, .5 on April 18, .4 on April 20, 1.7 and 2.4 on April 21, .6 and 1.2 on April 24, 7.5 on April 25 (although it is highly questionable as to what possible relevance state cases on judicial notice would have in federal court), and 5 on April 28; as to May of 2000, 2 on May 1, .4, 1.8, .8, .1, and 1.5 on May 2, .1, 1.9, and 2.6 on May 3, .5, 1, and .4 on May 4, .4, 1.2, and .1 on May 8, 4 on May 10, .5 and 5.9 on May 11, 2 on May 12, 1.3 on May 16, .3 on May 18, 5 on May 23, .4 on May 25, 4.8 on May 26, 1.2 and .7 on May 31; as to June of 2000, 3.5 on June 1, 6.3 on June 2, 6 on June 3, .3 and 1.3 on June 5, .6, .6, and 1.5 on June 12, .3 and .8 on June 13, 1.7 on June 14, 1.2 on June 15, 1.6 on June 16, 3.5 on June 23, .3 and .4 on June 29, and 1 .3 on June 30; as to July of 2000, 3.6 and .5 on July 5, 1.2, 1.4, and 1.4 on July 6, 3.3 on July 7, .1 and 2.4 on July 10, 3.5 on July 11, .1 and 2.6 on July 12, .2 on July 14, .1, .4, and .9 on July 19, 3.1 on

July 20, .4 on July 24, .2 on July 26, .2, .2, and .9 on July 27; as to August of 2000, 1.3 on August 7, .2, .4, and.1on August 8, 1.2, and .2 on August 11.

[¶ 32] The foregoing paragraph produces a total of 185.3 hours. Applying the 8% discount (14.821 hours) produces a reduced total of 170.5 hours. Multiplying this times $125.00 per hour produces a figure of $21,312.50. I find that the lodestar hourly fee as to Mr. Sells should not be increased.

[¶ 33] Added to this will be 75.62 hours for additional fees of $9,452.50.

[¶ 34] Thus, total additional fees of $76,125.00 are to be paid by the defendants. I have used all the *Johnson* factors and have taken into account the importance of this case in establishing South Dakota law as to reapportionment timing.

[¶ 35] The United States Court of Appeals for the Eighth Circuit awarded attorney fees and costs on appeal of $34,283.89. I had previously awarded $33,598.78 plus interest. The additional award is now $76,125.00 plus interest. These items total $144,007.67 plus interest.

[¶ 36] This matter has been delayed quite some time. Justice demands that interest be paid. The mandate from the Court of Appeals was issued on February 25, 2002, and interest should be paid from that date until $76,125.00 is paid, interest to be computed and paid pursuant to SDCL 21–1–13.1 at the category B rate set by the South Dakota Legislature, namely 10% per annum. The normal federal rate on judgments will not be applied since that would not be justice to do so.

[¶ 37] Normally, all legal fees for services performed in the State of South Dakota are subject to sales taxes. Counsel for the plaintiffs have not included in their requests any allowances to pay such taxes. It would be circuitous to order the State to first pay such taxes to counsel for plaintiffs and then collect them from the same attorneys. On the other hand, it would be a matter of injustice for the defendants or the State to later claim that such taxes are due and any such injustice will not be permitted.

[¶ 38] Now, therefore,

[¶ 39] IT IS ORDERED, as follows:

1) Additional attorney fees shall be paid by the State of South Dakota to Laughlin McDonald in the amount of $45,360.00.

2) Additional attorney fees shall be paid by the State of South Dakota to Bryan Sells in the amount of $30,765.00.

3) Interest shall be paid on all awards at 10% per annum from February 25, 2002, until paid.

4) No other costs shall be taxed by the clerk.

5) All other requests for attorney fees and expenses are denied.

6) If the defendants or the State of South Dakota ever claim and establish that sales taxes are due on the fees herein awarded, sales taxes shall also be awarded to counsel for plaintiffs for all legal fees ordered paid, whether by the trial court or by the Court of Appeals.