2005 SD 113

**In re SOUTH DAKOTA MICROSOFT ANTITRUST LITIGATION.**

No. 23506.

Supreme Court of South Dakota.

Argued Aug. 31, 2005.

Decided Nov. 16, 2005.

See also 253 F.3d 34.

David B. Tulchin of Sullivan & Cromwell, L.L.P., New York, New York, Gene N. Lebrun of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, South Dakota, Attorneys for appellant Microsoft.

Mark A. Moreno of Schmidt, Schroyer, Moreno & Lee, Pierre, South Dakota, Ben Barnow of Barnow & Associates, PC, Chicago, Illinois, Attorneys for appellee SD Microsoft Antitrust Litigation.

GILBERTSON, Chief Justice.

[¶ 1.] South Dakota indirect-purchasers of Microsoft operating systems software brought a state antitrust class action against Microsoft. A settlement agreement reached by the parties and approved by the trial court included the payment of Plaintiffs' "reasonable attorney fees" by Microsoft. After the settlement was approved by the trial court, it retained jurisdiction to decide the Plaintiffs' application for attorney fees, expenses and costs at a later date. On November 10, 2004, the trial court entered an order awarding attorney fees, expenses and costs in the amount of $2,278,286 to be paid by Microsoft to Plaintiffs. Microsoft appeals; we reverse and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURE

[¶ 2.] The genesis of the South Dakota antitrust suit, as well as dozens of other antitrust claims brought against Microsoft, occurred in 1998 when the United States Department of Justice and several state attorneys general filed an antitrust action in the United States District Court for the District of Columbia. *See United States v. Microsoft Corp.*, 84 F.Supp.2d 9 (D.D.C. 1999) (*Microsoft I* ). On November 5, 1999, after a bench trial the District Court of Columbia issued 412 findings of fact surrounding Microsoft's conduct with regard to its operating systems software (OSS) and its monopoly power over the web browser market. *Id.* The District Court found Microsoft liable for its alleged tying of Internet Explorer to its Windows products, attempting to monopolize the web browser market, and maintaining an operating system monopoly. *United States v. Microsoft Corp.*, 87 F.Supp.2d 30 (D.D.C.2000) (*Microsoft II* ). However, on June 28, 2001, that court was overturned in part on appeal to the Court of Appeals for the District of Columbia Circuit, which reversed on the issues of attempted monopolization, and on the District Court's use of a per se analysis rather than a rule of reason analysis on the tying claim. *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C.Cir.2001) (*Microsoft III* ). The District Court's holding that Microsoft improperly maintained a monopoly was upheld. *Id.* The case was remanded in order to determine if the tying violation was committed, and the remedies of the lower court were vacated. *Id.*

[¶ 3.] In late 1999 and early 2000, in the wake of the plaintiffs' success in the findings of fact in *Microsoft I,* more than 130 antitrust class actions were filed against Microsoft in state and federal courts throughout the country. In June 2000, the Judicial Panel on Multidistrict Litigation transferred all overcharge actions against Microsoft that were pending in federal courts to the United States District Court for the District of Maryland. State claims that could not be removed to federal court remained in their respective jurisdictions. *See also In re Microsoft Corp. Antitrust Litigation,* 274 F.Supp.2d 736 (D.Md.2002) (*Microsoft IV*).

[¶ 4.] In March 2000, four antitrust class actions were filed in South Dakota state courts against Microsoft alleging violations of South Dakota antitrust laws.[1] Three of those cases were consolidated in Hughes County and comprise the instant case. The Class Members were persons and entities residing in South Dakota who were indirect purchasers of Microsoft Windows or MS–DOS operating systems software (OSS) between March 10, 1996 and December 31, 2002.[2] After consolidation, the single amended complaint alleged Microsoft maintained a monopoly in the South Dakota marketplace. Plaintiffs alleged Microsoft established its monopoly by engaging in various anti-competitive acts, "including stifling innovation in the market place and overcharging customers." *In re South Dakota Microsoft Anti-*

*trust Litig.,* 2003 SD 19, ¶ 2, 657 N.W.2d 668, 670. The Plaintiffs claimed that Microsoft's actions "eliminated competition in the market for similar OSS, deprived purchasers of the benefits of a free market and injured consumers by forcing them to purchase Microsoft OSS at artificially high and supra-competitive prices in violation of South Dakota antitrust laws." *Id.*

[¶ 5.] After certification of the class was granted at the circuit court level, Microsoft appealed to this Court for discretionary review. *Id.* ¶ 3. We held the circuit court did not abuse its discretion when it certified the class, as Plaintiffs had met their "threshold showing" of harm to South Dakota consumers who were indirect purchasers of these Microsoft products. *Id.* ¶ 32, 657 N.W.2d at 679.

[¶ 6.] On remand for further proceedings, the circuit court appointed Ben Barnow, of the firm of Barnow & Associates, P.C. in Chicago, Illinois; Mark Moreno, of Schmidt, Schroyer & Moreno, P.C. in Pierre, South Dakota; and Leonard Simon of Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P (now known as Lerach Coughlin Stoia Geller Rudman & Robbins LLP) in San Diego, California, as co-lead counsel for Plaintiffs. The circuit court also appointed lawyers from two other South Dakota firms and four other out-of-state firms to serve on Plaintiffs' Executive Committee.

---

1. *Gengler v. Microsoft Corp.,* No. 00–101 was filed in Lawrence County; *Schoenfelder v. Microsoft Corp.,* No. 00–235 was filed in Pennington County; and *Swanson v. Microsoft Corp.,* No. 00–91 was filed in Hughes County. The fourth antitrust suit was also filed in Hughes County, *South Dakota Assoc. of Plumbing, Heating and Cooling Contractors v. Microsoft Corp.,* but was removed to the United States District Court for the District of Maryland by Microsoft.

2. The final settlement limited the Class to South Dakota persons and entities who resided in South Dakota and who indirectly purchased Windows 95, Windows 98, Windows 98 Second Edition, Windows Millennium, and various versions of Microsoft Office, Word, and Excel for use in South Dakota, and who did not purchase the software for resale. Excluded from the Class were all government entities of any kind and Microsoft, its officers, directors, successors and subsidiaries.

[¶ 7.] The circuit court ordered that all pre-trial discovery be coordinated with the federal antitrust actions pending against Microsoft in the United States District Court for the District of Maryland (hereinafter referred to as the "MDL court"). The circuit court's order directed the parties to "make every effort to avoid duplication of discovery that is propounded and taken in the federal [MDL] action or in any state action where counsel for Plaintiffs and Defendant both have the option to participate."

[¶ 8.] On October 24, 2003, eight months after this Court affirmed the class certification, counsel for Plaintiffs and Microsoft reached a proposed settlement for the South Dakota litigation. The circuit court granted preliminary approval of the settlement on November 12, 2003. The terms of the settlement required that Microsoft provide each member of the South Dakota class who submitted a valid claim form by the close of the claims period on October 15, 2004, with a voucher with a face value of twelve dollars ($12.00) or five dollars ($5.00), depending on the product purchased by the Class Member.[3] The vouchers entitled Class Members to be reimbursed up to the face value of their vouchers after purchasing a platform-neutral hardware or software product within four years of the close of the claims period. Class Members could aggregate and transfer vouchers up to a total of six-hundred and fifty dollars ($650).

[¶ 9.] The maximum value of the settlement was set at $9.33 million, assuming every member of the class submitted a valid claim. However, at the time the settlement was approved by the circuit court, it was unknown how many Class Members would avail themselves of the vouchers. The parties recognized the actual value of the vouchers claimed by Class Members would be less than the theoretical maximum value, and agreed to provide a *cy pres* distribution of vouchers to needy public schools.[4] Under the terms of the settlement, the *cy pres* distribution of vouchers would occur over a four-year period and would equal one-half of the difference between the $9.33 million figure and the actual value of vouchers ultimately issued to Class Members.

[¶ 10.] An additional term in the settlement agreement provided: "Counsel . . . shall attempt to negotiate fees following negotiation of this class settlement. . . . If the parties fail to agree, counsel shall litigate the fee issues, and each party is free to argue for what it believes to be reasonable fees. Microsoft shall also be responsible for the reasonable costs and expenses of this litigation to the extent awarded by the Court."

[¶ 11.] The parties were ultimately unable to negotiate fees, and litigation ensued. Plaintiffs requested $3.1 million in attorney fees using a percentage of the common fund method of calculation, $301,455.83 in expenses, and that Microsoft pay sales tax on the fees. Plaintiffs argued thirty percent of the full value of the $9.33 million dollar settlement was reasonable in light of the difficulty of the litigation, the benefits obtained for Class Mem-

---

3. Windows OSS products purchasers were eligible to receive the twelve dollar voucher, while applications (Office, Word and Excel) products purchasers were eligible for the five dollar voucher.

4. Schools eligible for the *cy pres* distribution include all public, tribal and Bureau of Indian Affairs elementary, middle, junior high, and high schools in South Dakota, at which at least fifty percent of the attending students are eligible to receive free or reduced-priced meals through the National School Lunch Program. The number of eligible schools is 219, which serve more than 27,294 South Dakota children.

bers, the skill of the attorneys involved, and the risk incurred by the attorneys when they agreed to take the case on a contingency fee basis.

[¶ 12.] Plaintiffs provided a cross-check of the percent of the common fund figure using a lodestar[5] figure of $1,496,178.52. The lodestar was computed by Plaintiffs using three methods. First, for firms that submitted contemporaneous time sheets that specified the case and the task performed, hours worked on the South Dakota litigation were multiplied by hourly rates. Local counsel, Mark A. Moreno of Pierre, South Dakota, submitted an hourly rate of $300, as did his partner Ronald G. Schmidt; Sioux Falls counsel James Robbennolt submitted an hourly rate of $100; Sioux Falls counsel Timothy J. Dougherty submitted an hourly rate of $250; the firm of Johnson, Eiesland, Quinn, Huffman and Clayborne of Rapid City submitted a rate of $275 per hour for Glenn H. Johnson, $250 for Richard E. Huffman, $250 for Courtney R. Clayborne and $75 for others who worked on the file. Out-of-state firms from Chicago, New York and San Diego submitted hourly rates ranging from $175 to $630 per hour.

[¶ 13.] Second, four firms involved with several cases against Microsoft in multiple jurisdictions, Barnow & Associates, William J. Harte, Ltd., Harold B. Gold, P.C., and Vahldiek, Cano & Petroski (VC & P), did not maintain contemporaneous time records that allocated time by specific Microsoft case. Lodestar figures for the Barnow, Harte, Gold and VC & P firms were estimated rather than computed, as their respective contemporaneous time sheets included all work conducted by the firms for the multiple Microsoft cases each firm worked on during the time frame of the South Dakota litigation.[6] In his affidavit that accompanied the summary figures listed below, lead counsel Barnow stated he reviewed the time entries and cost expenditures for his firm's time and the time sheets submitted by the other three firms, and allocated twenty percent to the South Dakota litigation using as rationale his "knowledge of the case, and the litigation, the coordination efforts and the results achieved." The computations and hourly rates submitted by Barnow were as follows:

| Barnow & Associates | Hourly Rate | Hours Worked | Total Fees |
|---|---|---|---|
| Ben Barnow, partner | $500 | 3,017.6 | $1,509,530.00 [7] |
| Alan Goldberg, partner | 277 | 678.9 | 188,565.00 [8] |
| Sharon Harris, associate | 190 | 463.4 | 88,151.00 [9] |
| Sheila Lynch, associate | 175 | 715.3 | 125,324.85[10] |

5. Lodestar is defined as the product of the number of attorney hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *City of Riverside v. Rivera*, 477 U.S. 561, 568, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)).

6. Plaintiffs' lead counsel, Barnow, had been appointed as the lead counsel in the MDL proceedings. In addition, Barnow was also lead counsel in state antitrust litigation against Microsoft in three other states: Kansas, Wisconsin and Michigan. Barnow was also minimally involved in similar cases in Minnesota, West Virginia, North Carolina and Maine.

7. The product of $500 per hour times 3,017.6 hours equals $1,508,800 rather than the figure as listed by Barnow & Associates.

8. The product of $277 per hour times 678.9 hours equals $188,055.30 rather than the figure as listed by Barnow & Associates.

9. The product of $190 per hour times 463.4 hours equals $88,046 rather than the figure as listed by Barnow & Associates.

10. The product of $175 per hour times 715.3 hours equals $125,177.50 rather than the figure as listed by Barnow & Associates.

| | | | |
|---|---|---|---|
| Law Clerk | 41 | 16.3 | 673.00[11] |
| Paraprofessional | 45 | 213.8 | 9,171.00[12] |
| Firm subtotal | | | 1,921,414.85[13] |
| 20% allocation to SD | | | × .20 |
| Firm Total | | | $ 384,282.97[14] |

| William J. Harte, Ltd. | Hourly Rate | Hours Worked | Total Fees |
|---|---|---|---|
| William J. Harte | $350 | 185.5 | $ 64,925.00 |
| William J. Harte | 400 | 136.5 | 54,600.00 |
| William J. Harte | 425 | 8.0 | 3,400.00 |
| Paralegal | 50 | 1.25 | 62.50 |
| Firm sub total | | | 122,987.50 |
| 20% allocation to SD | | | × .20 |
| Firm Total | | | 24,597.50 |

| Harold B. Gold, P.C. | | | |
|---|---|---|---|
| Harold B. Gold | 400 | 20.0 | 8,000.00 |
| Firm subtotal | | | 8,000.00 |
| 20% allocation to SD | | | × .20 |
| Firm Total | | | 1,600.00 |

| Vahldiek, Cano & Petroski | | | |
|---|---|---|---|
| Pete Petroski | 400 | 125.25 | 50,100.00 |
| Paralegal | 100 | 48.75 | 4,875.00 |
| Firm sub total | | | 54,975.00 |
| 20 allocation to SD | | | × .20 |
| Firm Total | | | $ 10,995.00 |

[¶ 14.] A third computation method was used to determine a lodestar figure for the MDL attorneys. MDL fees were requested as a share of the expense for the coordinated discovery effort, and other work product of the MDL attorneys used in the South Dakota litigation. The method of computation used population figures for each jurisdiction involved to determine the percentage allocation to a specific jurisdiction. The MDL attorneys' lodestar figure for South Dakota's share as computed under Plaintiffs' proposed methodology totaled $558,574.55.

[¶ 15.] Finally, Plaintiffs applied a multiplier of two to the $1,496,178.52 lodestar figure as a cross-check of their percentage of the benefit fee request of $3.1 million. Plaintiffs contended the multiplier was justified by 1) the size of the fund created and the number of persons benefited by the fund, 2) the absence of objections by Class Members to the proposed fees, 3) the skill and efficiency of the attorneys involved, 4) the complexity and duration of the litiga-

11. The product of $41 per hour times 16.3 hours equals $668.30 rather than the figure as listed by Barnow & Associates.

12. The product of $45 per hour times 213.8 hours equals $9,621 rather than the figure as listed by Barnow & Associates.

13. The total amount listed under the fees column equals $1,921,414.85 using Barnow & Associates incorrect computations for rate times hour. However, if the correct amounts as listed in N7 through N12 are used, the total amount adds up to $1,920,368.10.

14. This figure represents twenty percent of the erroneous total as computed by Barnow & Associates. Twenty percent of the corrected figure equals ($1,920,368.10 × .20) $384,073.62. The difference between the two figures, $209.35, is not significant as a dollar figure, but rather points to the lack of accuracy in the computations.

tion, 5) the risk of no recovery due to the contingent nature of the case and the risk of non-payment, 6) the amount of time devoted to the case by class counsel; and, 7) awards in similar cases.

[¶ 16.] In addition to attorney fees, Plaintiffs claimed expenses for all Plaintiffs' firms in the amount of $301,455.83. This figure included estimated expenses of twenty percent of all Microsoft litigation expenses for the Barnow, Harte, Gold and VC & P firms, which totaled $72,848.95. In addition, an allocation of $206,882.12 in MDL attorney expenses was included in the figure.

[¶ 17.] Microsoft submitted a brief in opposition to the motion for fees and expenses. Microsoft argued in its brief, and at the motion hearing held on June 14, 2004, that the attorney fees requested should not be computed by a percentage of the benefit method. Instead, Microsoft argued the proper method was the lodestar method, which according to Microsoft's calculations totaled $389,292. Microsoft further argued the hourly rate customarily charged in central South Dakota for similar legal services was between $150 and $175 per hour, rather than the average of $550 used for Plaintiffs' Minneapolis based attorneys, and $630 used for Plaintiffs' California based attorneys. Microsoft also argued the twenty percent allocation of the Barnow, Harte, Gold and VC & P firms' attorney fees and expenses should be disallowed due to lack of contemporaneous record keeping. Instead, Microsoft proposed dividing the fees and expenses equally across all Microsoft antitrust cases

worked on by these four firms. Microsoft also opposed allocating any MDL attorneys' fees or expenses to the South Dakota litigation.

[¶ 18.] Microsoft further opposed the multiplier requested by Plaintiffs. It maintained the multiplier was not warranted by the settlement reached by the parties, as the settlement was not superior or exceptional in nature. Microsoft also noted the multiplier would in effect compensate the top billing California attorney at a rate of $1,260 per hour, the top Minnesota attorney at a rate of $1,000 per hour, and local counsel Mark Moreno at $600 an hour, resulting in hugely excessive compensation to these attorneys.

[¶ 19.] Microsoft agreed that the percentage of the benefit method could be used to cross-check the lodestar figure under South Dakota law. However, Microsoft argued the value of the benefit should not be measured as a percent of the maximum value of the fund created ($9.33 million), but rather against an estimate of the number of vouchers that would be redeemed by Class Members plus the value of the *cy pres* trust. Microsoft contended the total value should be computed using a claims rate of between five and twenty percent based on data from other similar settlements.[15] The total value of the settlement would then be in the range between $4.66 million and $6.0 million.[16] Using these figures, Microsoft argued the $3.1 million requested by Plaintiffs would result in an attorney fee award of between 66.5 percent and 51.67 percent of the total

15. At the time of the hearing, the full claims rate was unknown as the claims period had yet to expire. The final number of vouchers ultimately claimed was less than five percent.

16. The *cy pres* settlement value was calculated as one-half of the difference between the max-

imum settlement value of $9,330,000 less the $466,500 to be received by Class Members at a hypothetical five percent claims rate, and less the $1,866,000 to be received by Class Members at a hypothetical twenty percent claims rate.

benefit received by Class Members.[17] Microsoft's proposed lodestar figure of $389,292 would result in a percentage of the benefit figure of almost eight percent under a projected five percent claims rate, and almost seven percent under the projected twenty percent claims rate.[18] Microsoft also challenged the computation of expenses, maintaining expenses should total $66,575. Total attorney fees and expenses proposed by Microsoft totaled $445,683.

[¶ 20.] At the hearing on attorney fees, the trial court requested that Microsoft disclose the hourly rate it paid to its attorneys for the South Dakota litigation. The trial court requested the information in order to compare the hourly rate submitted by Plaintiffs with the hourly rate paid by Microsoft, and determine a prevailing rate for the area for antitrust litigation. Microsoft agreed to submit what information it could, noting that at least one of the three firms that represented Microsoft did not use a traditional "rate times hours worked" billing practice, but rather had agreed contractually to a flat rate for the representation. At the hearing, counsel for Microsoft stated that all attorneys involved in defending the South Dakota action had been paid a total of $455,000. Microsoft further argued that comparing the hourly rate requested by Plaintiffs with the hourly rate paid to Microsoft's attorneys was not the proper method for determining the typical hourly rate for the locality. Microsoft maintained that total attorney fees paid by it should be compared to the lodestar amount requested by Plaintiffs. If the amounts were similar, then under this Court's holding in *Dooley v. Dooley*, 1999 SD 136, 601 N.W.2d 277, the amount requested by the fee applicant would be reasonable.

[¶ 21.] In a letter addressed to the trial court after the hearing, Microsoft disclosed the specific rates it had paid attorneys at its two South Dakota firms and one of its out-of-state firms located in Delaware. The South Dakota firms were paid between $175 and $225 per hour for legal services. However, for its New York firm, Microsoft did not disclose individual rates paid to attorneys, stating that their New York counsel "does not use standardized hourly billing rates." Instead, Microsoft provided a blended rate of $538 for all its New York attorneys, associates and paralegals who worked on the South Dakota litigation.

[¶ 22.] On November 10, 2004, the trial court issued its findings of fact and conclusions of law, finding that the settlement agreement did not create a common fund or pool of money, but did create a substantial benefit to Class Members and others through the *cy pres* remedy. The trial court concluded the appropriate method for determining attorney fees was the lodestar method. It also accepted the hourly rates as proposed by Plaintiffs, and the twenty percent allocation of attorney hours and expenses for the Barnow, Harte, Gold and VC & P firms as reasonable given the amount of time these firms spent on the South Dakota, Kansas, Wisconsin and Michigan cases. The trial court excluded all MDL attorney fees and expenses. The trial court based the exclu-

---

**17.** Plaintiffs' requested fee of $3.1 million divided by $4.66 million, the value derived using Microsoft's projected five-percent claims rate, equals 66.5 percent of the benefit derived from the suit. A projected twenty percent claims rate would result in a figure of 51.67 percent.

**18.** Microsoft's lodestar computation of $389,292 divided by a settlement value of $4,898,000 at the five percent claims rate results in a 7.95 percent fee. The use of the twenty percent claims rate results in a total benefit of $5,598,000 and a 6.95 percent fee.

sion on the fact that the MDL attorneys were not counsel of record, and Microsoft did not specifically agree to pay for their services as part of the South Dakota settlement.

[¶ 23.] The trial court awarded attorney fees in the amount of $2,064,000, $94,574 in expenses and $119,712 in sales tax, for a total of $2,278,286 to be paid by Microsoft. The final figure represented fees and expenses for both the litigation of the class action and the litigation on the issue of fees and expenses. The trial court determined the lodestar figure was $1,032,000 and applied a multiplier of two to arrive at the $2,064,000 figure. The lodestar amount included the twenty percent allocation as proposed by Barnow, but excluded all MDL litigation fees. In addition, the trial court applied the multiplier to the $100,000 in attorney fees claimed by Plaintiffs for litigating attorney fees and expenses.

[¶ 24.] In its memorandum on the motion dated September 29, 2004, and in its findings of fact and conclusions of law dated November 10, 2004, the trial court noted it used the percentage of the benefit method as a crosscheck on the lodestar/multiplier figure. However, no figures were contained in either document to support the trial court's findings of fact and conclusions of law that the crosscheck by the percentage of the benefit method supported a multiplier of two. It is unclear from the record how the trial court calculated the percentage of the benefit, and whether it used the full face value of the settlement agreement of $9.33 million, or adjusted the figure to reflect the predicted five to twenty percent claims rate.

[¶ 25.] Based on an actual lower than expected claims from Class Members, the final rate is expected to be less than five percent. Using a five-percent figure, the Class Members will receive approximately

$466,500 in vouchers, and the *cy pres* trust will receive approximately $4,431,750 in vouchers, for an estimated total value of $4.9 million in vouchers. However, the final amount of vouchers to be redeemed by Class Members and from the *cy pres* trust will be unknown until the end of the redemption period in October 2008.

[¶ 26.] Microsoft appeals the following issues:

1. Whether the circuit court erred when it accepted a twenty percent allocation to the South Dakota case of attorney hours from four of Plaintiffs' firms when those hours were expended on litigation in South Dakota and in seven other jurisdictions, but contemporaneous itemized billing records were not maintained by jurisdiction.

2. Whether the circuit court erred when it accepted the hourly rates claimed by Plaintiffs' counsel.

3. Whether the circuit court erred when it applied a multiplier of two to the fees of Plaintiffs' counsel.

4. Whether the circuit court erred when it applied the multiplier of two to post-settlement work of Plaintiffs' counsel.

5. Whether an award of attorney fees to lawyers in an antitrust class action is disproportionate and inconsistent with South Dakota law when the award greatly exceeds the amount recovered on behalf of the class.

6. Whether Plaintiffs' counsel are entitled to a fee award of no more than $390,000.

## STANDARD OF REVIEW

[¶ 27.] A trial court's award of attorney fees is reviewed by this Court under the abuse of discretion standard.

*Anderson v. Aesoph,* 2005 SD 56, ¶ 18, 697 N.W.2d 25, 31 (citing *Adrian v. McKinnie,* 2004 SD 84, ¶ 6, 684 N.W.2d 91, 94 (citing *Osgood v. Osgood,* 2004 SD 22, ¶ 9, 676 N.W.2d 145, 148)). Abuse of discretion occurs when the trial court proceeds "to an end or purpose not justified by, and clearly against reason and evidence." *Id.* (citing *In re South Dakota Microsoft Antitrust Litigation,* 2003 SD 19, ¶ 5, 657 N.W.2d at 671 (quoting *Black v. Class,* 1997 SD 22, ¶ 27, 560 N.W.2d 544, 546)). In other words, "[a] fee award 'is within the ... court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous.'" *Loughner v. Univ. of Pittsburgh,* 260 F.3d 173, 177 (3rdCir.2001) (citing *Pennsylvania Envtl. Def. Found. v. Canon–McMillan Sch. Dist.,* 152 F.3d 228, 232 (3rdCir.1998)). Under this standard, "we do not determine whether we would have made a like decision, only whether a judicial mind, considering the law and the facts, could have reached a similar decision." *Anderson,* 2005 SD 56, ¶ 18, 697 N.W.2d at 31 (citing *In re South Dakota Microsoft Antitrust Litigation,* 2003 SD 19, ¶ 5, 657 N.W.2d at 671 (quoting *State v. Wilkins,* 536 N.W.2d 97, 99 (S.D.1995))). When applying the abuse of discretion standard of review, "we must be careful not to substitute our reasoning for that of the trial court." *Id.* (quoting *State v. Larson,* 512 N.W.2d 732, 736 (S.D.1994)).

 [¶ 28.] When reviewing a trial court's award of attorney fees, questions of fact are reviewed under the clearly erroneous standard. *Brooks v. Milbank Ins. Co.,* 2000 SD 16, ¶ 17, 605 N.W.2d 173, 178 (citing *Howie v. Pennington County,* 1997 SD 45, 563 N.W.2d 116). Standards and procedures applied by the trial court in determining attorney fees are legal questions. *Loughner,* 260 F.3d at 177 (citing *Smith v. Philadelphia Housing Auth.,* 107

F.3d 223, 225 (3rdCir.1997)). As such, the trial court's conclusions of law are given no deference and are reviewed by this Court de novo. *Sherburn v. Patterson Farms, Inc.,* 1999 SD 47, ¶ 4, 593 N.W.2d 414, 416 (citing *City of Colton v. Schwebach,* 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771). However, a trial court's decision based on an error of law can be by definition an abuse of discretion. *State v. Vento,* 1999 SD 158, ¶ 5, 604 N.W.2d 468, 469 (quoting *State v. Richards,* 1998 SD 128, ¶ 9, 588 N.W.2d 594, 595).

## ANALYSIS AND DECISION

 [¶ 29.] South Dakota utilizes the American rule that each party bears the burden of the party's own attorney fees. *Crisman v. Determan Chiropractic, Inc.,* 2004 SD 103, ¶ 26, 687 N.W.2d 507, 513 (citing *Public Entity Pool for Liability v. Score,* 2003 SD 17, ¶ 7, 658 N.W.2d 64, 67–68). However, two exceptions to this general rule exist, first when a contractual agreement between the parties entitles the prevailing party to attorney fees, and second when an award of attorney fees is authorized by statute. *Id.* (citing *City of Aberdeen v. Rich,* 2003 SD 27, ¶ 25, 658 N.W.2d 775, 781). The fees awarded by the court in each case must be reasonable for the services rendered. *Duffy v. Circuit Court Seventh Judicial Circuit,* 2004 SD 19, ¶ 16, 676 N.W.2d 126, 134 (citing *City of Sioux Falls v. Kelley,* 513 N.W.2d 97, 111 (S.D.1994) (citing *City of Bismarck v. Thom,* 261 N.W.2d 640, 642 (N.D.1977) (quoting *Morton County Bd. of Park Comm'rs v. Wetsch,* 136 N.W.2d 158 (N.D. 1965)))). This Court announced several factors for consideration in determining reasonable attorney fees in a civil case in *City of Sioux Falls v. Kelley:*

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

513 N.W.2d at 111 (citing Model Rules of Prof'l. Conduct R1.5). The fee should not be determined by any single factor, but rather all of the factors should be taken into consideration in determining a reasonable fee. *Crisman*, 2004 SD 103, ¶ 30, 687 N.W.2d at 514 (citing *Duffy*, 2004 SD 19, ¶ 16, 676 N.W.2d at 134)

 [¶ 30.] However, before considering any of the factors listed above, the calculation of attorney fees *must* begin with the hourly fee multiplied by the attorney's hours. *Id.*

We are not under the illusion that a 'just and adequate' fee can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees. However, we are convinced that this simple mathematical exercise is the only legitimate starting point for analysis. It is only after such a calculation that other, less objective factors, can be introduced into the calculus. The trial court is required "to make specific findings based upon the factors."

*Id.* (quoting *Duffy*, 2004 SD 19, ¶ 18, 676 N.W.2d at 134) (internal citations omitted).

[¶ 31.] Plaintiffs argued at the fee hearing that federal case law should control the determination of reasonableness of attorney fees in an indirect purchaser antitrust class action brought under SDCL 37–1–14.3.[19] As rationale for this proposition Plaintiffs cited our decision in *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985). In that case we held that "because of the similarity of language between federal and state antitrust statutes and because of the legislative suggestion for interpretation found in SDCL 37–1–22, great weight should be given to the federal cases interpreting the federal statute." *Id.* (citing *Neyens v. Roth*, 326 N.W.2d 294 (Iowa 1982)). In that case, we were faced with the issue of whether the exclusion announced by the United States Supreme Court in *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943),[20] provided a city with immunity from state antitrust liability for conducting waste collection and disposal services, when cities are empowered to collect and dispose of garbage and other waste material under SDCL 9–32–11. Lacking precedent on the issue, we looked to federal case law in that instance and applied the test from *Parker* to determine if the action taken by the city was clearly articulated

---

19. SDCL 37–1–14.3 provides in relevant part: A person injured in his business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. The trier of facts shall increase recovery under this section to three times the damages sustained.

20. The United States Supreme Court held that "nothing in the language of the Sherman Act or in its history suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Byre*, 362 N.W.2d at 74 (quoting *Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313, 87 L.Ed. 315).

and affirmatively expressed as a state policy, and therefore excluded the city from antitrust liability for engaging in that action. *Byre*, 362 N.W.2d at 74.

[¶ 32.] In the instant case, the original action was brought under SDCL 37–1–14.3. The parties reached a settlement agreement, and within the agreement Microsoft agreed to pay reasonable attorney fees. Applicable South Dakota case law does exist on the issue of reasonable attorney fees in civil litigation, but not specifically for antitrust litigation. As such, we will give great weight to federal law in applying our *Kelley* factors, but will not supplant our current case law on attorney fees in civil cases as suggested by Plaintiffs at the fee hearing and as alluded to in their brief.

[¶ 33.] **1. Whether the circuit court erred when it accepted a twenty percent allocation to the South Dakota case of attorney hours from four of Plaintiffs' firms when those hours were expended on litigation in South Dakota and in seven other jurisdictions, but contemporaneous itemized billing records were not maintained by jurisdiction.**

[¶ 34.] In the context of setting attorney fees in a divorce action, we have previously held that time spent on a case is an important factor that must be considered along with other factors. *Lien v. Lien*, 278 N.W.2d 436, 443 (S.D.1979). While the instant case is not a divorce action, the same "simple mathematical exercise" of multiplying attorney hours by typical rates applies to the determination of attorney fees in all civil actions. *See Crisman*, 2004 SD 103, ¶ 30, 687 N.W.2d at 514 (citing *Kelley*, 513 N.W.2d at 111). A trial judge should not have to guess at the out-of-court time spent on a case when fixing reasonable attorney fees. *Lien*, 278 N.W.2d at 443. Without an itemized state-ment of services rendered in the litigation, the trial court lacks sufficient information from which to conclude that an award of attorney fees is reasonable. *Dooley*, 1999 SD 136, ¶ 27, 601 N.W.2d at 282 (citing *Kappenman v. Kappenman*, 522 N.W.2d 199, 204 (S.D.1994)).

[¶ 35.] Similarly, we have held in the context of a 42 USC § 1983 claim for violation of a constitutional right by a public entity, that the fee shifting provision in 42 USC § 1983(b) limits re-covery to hours reasonably expended and properly documented. *Tri County Land-fill Ass'n, Inc. v. Brule County*, 2000 SD 148, ¶ 35, 619 N.W.2d 663, 675 (citing *Lunday v. City of Albany*, 42 F.3d 131, 133 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983))). In such cases, the fee applicant bears the burden of documenting hours expended. *Id.* ¶ 37 (citing *Jan R. Smith Constr. Co. v. DeKalb County*, 18 F.Supp.2d 1365, 1373–74 (1998)). When a fee applicant's evi-dence supporting hours worked is so inad-equate that it is almost impossible to make a conscientious and detailed inquiry into the validity of the representation, a reduc-tion in the fee request is warranted. *New York v. Microsoft Corp.*, 297 F.Supp.2d 15, 29 (D.D.C.2003) (citing *In re Donovan*, 877 F.2d 982, 994 (D.C.Cir.1989) (quoting *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939, 76 L.Ed.2d 40)).

[¶ 36.] As we have previously stated, "what is not billable to the client should not be billable to the opposing par-ty." *Tri County Landfill Ass'n*, 2000 SD 148, ¶ 35, 619 N.W.2d at 675. We see no need for a less stringent standard for de-termining hours worked in antitrust liti-gation, especially when attorney fees are recoverable either as a percentage of a common fund or shifted to the opposing party. "The burden is clearly on counsel to file adequately-documented applications

for fees and those who fail to meet that burden do so at their own risk." *In re Equity Funding Corp. of America Sec. Litig.*, 438 F.Supp. 1303, 1327 (D.C.Cal. 1977).

[¶ 37.] In the instant case, the hours submitted for Barnow, Harte, Gold and VC & P, the four firms in question, were expended on nine different cases filed in eight different jurisdictions. The firms were successful on several of the cases, but unsuccessful on others. However, the firms failed to record their time in a manner that makes it possible to accurately identify hours worked on the South Dakota litigation versus other cases, or claims, in other jurisdictions. The entries in these firms' time logs include descriptions of specific work done, but do not consistently indicate for which case, or if the work was for the benefit of all cases.[21] Because some entries do specify that the work pertained to the South Dakota litigation, Microsoft was able to submit an exhibit that summarized those time entries that specifically mention South Dakota or local counsel Moreno in the description line. These hours total 493.1 for the four firms of Barnow, Harte, Gold and VC & P.

[¶ 38.] In an affidavit accompanying the application for fees, Barnow, lead counsel for Plaintiffs in the instant case, estimated the time spent on the South Dakota case to be twenty percent of the total time worked on all Microsoft cases in which these four firms were involved. While the estimate may very well be true, there is no record for the trial court to determine if the hours claimed were expended on the South Dakota litigation, much less reasonably expended. Microsoft argues the trial court should have divided the total billings for the four firms equally across all eight jurisdictions in which the firms litigated cases against Microsoft. However, Microsoft's suggested methodology is as inaccurate as that suggested by Barnow, and also fails to provide the trial court with an adequate record.

[¶ 39.] The facts of this case illustrate the importance of maintaining a billing system capable of generating an accurate record of time expended when attorney fees are recoverable either by statute or by contract. The entire issue could have been avoided if these four firms had maintained such records. Given that the South Dakota, Kansas, Wisconsin, Michigan, Minnesota, West Virginia, North Carolina, and Maine cases were all conducted on a contingency fees basis and that either an application for, or negotiation or litigation on fees would ensue, these firms placed their claim for recovery of fees against Microsoft at risk by their lack of proper recordkeeping.

[¶ 40.] Given this is a case of first impression, the trial court did a commend-

---

21. Many of the descriptions used by these four firms also do not adequately describe the work done. For example, an entry on December 1, 1999 indicates Barnow had a "[d]iscussion with D. Weinstein; discussion with P. Petroski; discussion with B. Steinmetz." However, no topic is listed and no specific case is mentioned in the description. Some entries merely list such tasks as "Paraprofessional—research" and "Paraprofessional—file search." Given the lack of adequate record keeping demonstrated in these billing records, it is difficult to image how the trial court could have conducted a meaningful review of the time devoted to the South Dakota case as suggested in the dissent. *See infra* ¶ 87. In comparison, Moreno's time log provided detailed entries such as the one dated February 25, 2002: "Review portions of the file and materials received from Bob Gralewski; research; prepare proposed Order Approving Plan for Dissemination of Class Action, Notice Form, Daily Newspaper list, letter to Gene Lebrun, and Memorandum to Ben Barnow, Bob Gralewski, Bonney Sweeney, and Ralph Phalen."

able job of attempting to ascertain a figure, but lacked case law from this Court to guide it on the proper method for calculating reasonable attorney hours. The record indicates the trial court found that the twenty percent allocation of time for the Barnow, Harte, Gold and VC & P firms was reasonable. However, the record before us is deficient in that it requires the trial court to "guess at the out-of-court time spent on the case." *See Lien*, 278 N.W.2d at 443. The dissent correctly points out that the trial court found that "Mr. Barnow is State Lead Class Counsel in four states (South Dakota, Kansas, Wisconsin and Michigan), has had minimal involvement in four other states (North Carolina, West Virginia, Minnesota and Maine) and is the state lead counsel in the multidistrict litigation proceedings." *See infra* ¶ 87. However, this finding of fact does not answer the relevant question before the trial court: how many hours were reasonably expended on the South Dakota litigation and properly documented. *See Tri County Landfill Ass'n*, 2000 SD 148, ¶ 37, 619 N.W.2d at 675.

[¶ 41.] Lacking an adequate record, the trial court did not have sufficient information upon which to conclude that an allocation of twenty percent of attorney hours was reasonable. Nor did the trial court have an adequate record before it to determine that an award of $2,064,000 in attorney fees was reasonable. Without the proper record before it, the trial court was unable to pursue its task of determining reasonable attorney fees.

[¶ 42.] Given our limited options for determining hours worked due to the lack of contemporaneous records, we must select a method that arrives at a reasonable number of hours worked on the South Dakota litigation. Plaintiffs' suggested twenty percent allocation errs on the side of including hours worked on behalf of other jurisdictions. Microsoft's calculations based on entries it identified as mentioning South Dakota or local counsel Moreno is likely to be an underestimate of the hours, as Microsoft would not have the in-depth knowledge to identify South Dakota specific work that was labeled in another manner.

[¶ 43.] Therefore, we hold the most reasonable of the three suggested methods is the one-eighth allocation achieved by dividing total hours worked by the eight jurisdictions in which Plaintiffs worked. This method is the one least likely to include hours worked in other jurisdictions. While we realize that hours worked by Plaintiffs on the South Dakota litigation may be underrepresented using the one-eighth method, any error in determining reasonable hours worked should penalize the party responsible for inaccurately documenting those hours. It is unlikely a paying client would pay fees based on a best estimate of hours worked without protest. We will not force Microsoft to pay fees under a fee shifting contract that would not be billable to a paying client. We reverse the trial court on this issue, and remand for a recalculation of the lodestar figure consistent with this opinion.

[¶ 44.] **2. Whether the circuit court erred when it accepted the hourly rates claimed by Plaintiffs' counsel.**

[¶ 45.] The second half of the "simple mathematical exercise" in which the trial court must first engage, is a determination of the typical hourly rates for the legal services provided. *See Crisman*, 2004 SD 103, ¶ 30, 687 N.W.2d at 514. We do not accept the actual amount charged by an attorney as typical or reasonable per se. *State v. Guthrie*, 2001 SD 89, ¶ 13, 631 N.W.2d 190, 195 (citing *Kelley*, 513 N.W.2d at 111). Instead, the burden is on the fee applicant to show the hourly rate claimed is reasonable. *Blum v. Stenson*, 465 U.S.

886, 896 n. 11, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). A reasonable hourly rate is the ordinary fee for similar work in the community. *Guthrie*, 2001 SD 89, ¶ 13, 631 N.W.2d at 195 (citing *Emery v. Hunt*, 132 F.Supp.2d 803, 810 (D.S.D.2001) (*Emery I* ), *rev'd on other grounds*, 272 F.3d 1042 (8thCir.2001) (*Emery II* )). "The term 'reasonable hourly rate' has been defined as the 'hourly amount' to which attorneys *in the area* would typically be entitled for a given type of work on the basis of an hourly rate of compensation." *Emery I*, 132 F.Supp.2d at 810 (quoting *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 141 (8th Cir.1982) (quoting *Donaldson v. O'Connor*, 454 F.Supp. 311, 315 (N.D.Fla.1978))).

■■■■■ [¶ 46.] However, a fee applicant is not limited to paying out-of-state counsel the reasonable local rates. *Emery v. Hunt*, 236 F.Supp.2d 1033, 1039 (D.S.D. 2002) (*Emery III* ) (quoting *Avalon Cinema Corp.*, 689 F.2d at 141 (quoting *Donaldson*, 454 F.Supp. at 315)). "If 'a plaintiff can show he has been unable through diligent, good faith efforts to retain local counsel, attorney fees . . . are not limited to the prevailing rate in the . . . [jurisdiction] where the case is tried.' " *Id.* (quoting *Avalon Cinema Corp.*, 689 F.2d at 141) (quoting *Donaldson*, 454 F.Supp. at 315). If the fee applicant can show hiring out-of-state counsel was reasonable, the hourly rate for out-of-state counsel is determined by the attorney's degree of skill, experience, and reputation. *Anderson v. Wilson*, 357 F.Supp.2d 991, 997 (E.D.Ky.2005) (citing *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir.1995)). However, "the mere fact that a particular attorney 'has a national reputation for expertise in the relevant kind of litigation does not constitute proof that the attorney's expertise was necessary' to the litigation." *Id.* (quoting *Hadix*, 65 F.3d at 535).

### Local Counsel's Hourly Rates

■■■■ [¶ 47.] In the instant case, Plaintiffs submitted the hourly rates for all attorneys along with the required affidavit. Local counsel rates ranged from a low of $100 to a high of $275, except for Moreno and his partner Schmidt who each claimed a rate of $300. However, no evidence was provided by Plaintiffs in the record, other than their billing statements, to support a finding that the rates requested were the prevailing local rates in South Dakota for this type of litigation.

[¶ 48.] Instead, Microsoft entered into the record an affidavit by Robert C. Riter, Jr., a Pierre, South Dakota, litigation attorney with over thirty years of experience practicing law in Pierre and across the state, stating that the prevailing rate in South Dakota for attorneys with the same type of general litigation experience and years of practice as Moreno and other South Dakota attorneys who worked as Plaintiffs' local counsel, would be $150 to $175 per hour. Riter also stated in his affidavit that a South Dakota attorney with specialized experience, such as in the area of class action or antitrust litigation, would typically receive an hourly rate of $250 to $300.

[¶ 49.] A brief survey of recent specialized litigation in the United States District Court for the District of South Dakota, as well as in this Court, in which fees were payable by the losing party, reveals that prevailing rates for local counsel range from $150 to $225 per hour. *See Mock v. South Dakota Bd. of Regents*, 296 F.Supp.2d 1061, 1064 (D.S.D.2003) (holding local attorney fees of $180 to $225 per hour in Title VII gender discrimination suit were typical and reasonable); *Emery III*, 236 F.Supp.2d at 1040 (holding local lodestar hourly rates were $125 and $138 per hour in Voting Rights Act case); and *Ja-*

*ros v. LodgeNet Entm't. Corp.*, 171 F.Supp.2d 992, 1007 (D.S.D.2001) (holding local counsel rates for a sexual harassment suit under Title VII were reasonable at $190 per hour).

[¶ 50.] It was Plaintiffs' burden to show the rate requested was reasonable. Plaintiffs failed to show the typical rate for general litigation local counsel in South Dakota ranged up to a high of $300 per hour. Instead, Microsoft made the showing that typical rates for general litigation attorneys range from $150 to $175, while specialized litigation attorneys with substantial experience command between $250 and $300 per hour in South Dakota. Plaintiffs also offered no evidence in the record to substantiate local counsel Schmidt's experience in antitrust or class action litigation in order to justify an hourly rate in the range reserved for attorneys with substantial specialized litigation experience of $250 to $300 per hour as indicated in Riter's affidavit. Furthermore, local counsel Moreno admitted at oral arguments before this Court that he had very little expertise in the area of class action litigation at the time the Microsoft suit commenced, although he has gained considerable expertise over the past five years.

[¶ 51.] We hold that reasonable rates for local attorneys in class action and civil rights suits litigated over a comparable time frame have ranged from $150 up to a maximum of $225 per hour. The reasonable range of rates for attorneys with substantial expertise and experience in this specialized area of litigation is between $250 to $300. We remand the issue to the trial court to review the relevant evidence in the record and set a rate for Moreno and other South Dakota counsel within the prescribed ranges, depending on counsel's level of expertise and number of years practicing law. If the record is unclear as to an individual attorney's level of expertise, the trial court is instructed to allow a rate representative of the number of years of general litigation experience.

**Out-of-state Counsel's Hourly Rates**

[¶ 52.] Plaintiffs did not submit any evidence, affidavit or testimony in the record to show the need to hire out-of-state counsel. The burden was on Plaintiffs to show a good faith effort was made to hire local South Dakota counsel, and that no qualified counsel was available. Only after meeting that required showing would Plaintiffs be able to use typical hourly rates for the locality in which out-of-state counsel is located.

[¶ 53.] Instead, Plaintiffs focused exclusively at the fee hearing and in their brief on the hourly rate paid by Microsoft to its out-of-state counsel. Plaintiffs argue that Microsoft's out-of-state counsel's hourly rate was necessary to the determination of the hourly rate to be used in computing Plaintiffs' lodestar. Plaintiffs' theory fails in that it was their burden to establish the typical hourly rate for antitrust litigation in South Dakota, and if they were able to show local counsel was unavailable it was then their burden to establish the typical hourly rate for out-of-state counsel.

[¶ 54.] Lacking South Dakota precedent in this narrow area of the law, the trial court made an extensive attempt at using other South Dakota attorney fees cases for guidance. For this reason, the trial court ordered Microsoft to submit via sealed record the hourly rate paid to their defense counsel. However, the trial court misread our holding in *Dooley*, 1999 SD 136, ¶¶ 24 –26, 601 N.W.2d at 281. *Dooley* does not stand for the proposition that comparing hourly rates charged by the plaintiff's counsel and the defendant's counsel results in an "apples to apples" comparison that generates a "typical" rate for the locality. *Dooley* stands for the

proposition that when *total* attorney fees of plaintiff's counsel and *total* attorney fees of defendant's counsel are roughly equal, the comparison supports the conclusion that the amount of attorney fees requested by the prevailing party is reasonable. *Dooley,* 1999 SD 136, ¶ 24, 601 N.W.2d at 281 (citing *Paul v. Paul,* 616 P.2d 707 (Wyo.1980)). However, there is no support in South Dakota case law for a comparison of hourly rates in this context.

[¶ 55.] Other courts that have wrestled with this issue have resorted to one of at least three methods for determining local rates and out-of-state rates when local counsel is not available. One alternative is to consult a salary survey such as the *Survey of Law Firm Economics,* published by Altman Weil, Inc., or other surveys such as the *National Journal Directory of the Legal Profession* (B. Gerson, M. Liss & P. Cunningham eds., 1984). *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 56 (2nd Cir.2000); *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 226, 231 (2nd Cir.1987); *Coppedge v. Franklin County Bd. of Educ.,* 345 F.Supp.2d 567, 577 (E.D.N.C.2004); *In re WICAT Sec. Litig.,* 671 F.Supp. 726, 733 (D.Utah 1987). Another is to review recent fee awards by other courts. *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d at 231; *In re WICAT Sec. Litig.,* 671 F.Supp. at 733. The third method is to rely on the court's own experience in setting fee awards in class actions. *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d at 231; *Coppedge,* 345 F.Supp.2d at 577; and *In re WICAT Sec. Litig.,* 671 F.Supp. at 733.

[¶ 56.] In their brief to this Court, and in their proposed findings of fact and conclusions of law that were eventually accepted verbatim by the trial court, Plaintiffs cited to comments made by Judge James Zagel, United States District Court for the District of Northern Illinois, in an interview on awarding reasonable attorney fees. *See* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 105–06 (Federal Judicial Center 1994), *available at* http://www.fjc.gov /public/pdf.nsf/ lookup/attyfees. pdf/$File/attyfees.pdf. Plaintiffs contend Judge Zagel's comments support their proposition that Microsoft's refusal to reveal hourly rates may be used as a comparison to draw the conclusion that Plaintiffs claimed rates are reasonable. However, Plaintiffs neglected to inform the trial court, as well as this Court, that those comments were in relation to comparing the number of hours of attorney time expended by plaintiff's counsel with hours expended by defendant's counsel in order to determine if the *attorney hours* claimed were reasonable. Judge Zagel's comments do not support Plaintiffs' assertion that the comparison is valid for hourly rates. *See Id.*[22]

[¶ 57.] The attempt by Plaintiffs to obtain from Microsoft the hourly rates it paid for its local and out-of-state counsel was without legal basis in the law. In addition, Microsoft's failure to produce all hourly rates, and its complete billing records, should not have been used as evidence that Microsoft's rates were higher than those requested by Plaintiffs, and as

---

22. The only reported case located by this Court in which a trial court based its finding of the number of reasonable attorney hours solely on the defendant's failure to respond to an inquiry about the amount of time spent by defense counsel, was overturned on appeal. *Loughner,* 260 F.3d at 179. The Third Circuit Court of Appeals stated: "The Court does not

explain how defense counsel's inability or failure to provide the hours they charged on this case, alone, supports the conclusion that [plaintiff's counsel's] 506 attorney hours is reasonable...." *Id.* The appellate court overturned the trial court, holding the trial court's analysis was scant at best and its conclusion a non-sequiter. *Id.*

justification for allowing rates beyond any that have ever been awarded in South Dakota. The rate structure Microsoft entered into with counsel from Delaware and New York under a private contract is not determinative of the typical rate for local counsel, or the typical rate for out-of-state counsel in Barnow's locality (Chicago), or VC & P's locality (San Diego).

[¶ 58.] Plaintiffs devoted a significant amount of their brief to discussing what Microsoft failed to reveal about its private contract with out-of-state firms for legal services. Aside from failing to disclose the hourly rate for out-of-state counsel, Plaintiffs argue that Microsoft failed to provide any billing records for some of its attorneys, and that some attorney hours were not included in the records Microsoft did submit. Plaintiffs also take issue with the fact that Microsoft's New York defense counsel did not lower his rates to the local rate suggested by Microsoft as the maximum rate for South Dakota. All of these arguments are immaterial to the showing that Plaintiffs were required to make in order to establish reasonable hourly rates. Microsoft bore no burden to produce accurate billing records from which the trial court could compute attorney hours, or compute a local and an out-of-state attorney rate. Microsoft sought to pay its own attorney fees under private contract, not to obtain payment for its own legal defense from the Plaintiffs by court award. Microsoft's attempt to comply with the trial court's order may not have been as complete as it could have been, but nonetheless is an insufficient basis to hold that Plaintiffs' claimed rates are typical for antitrust litigation in South Dakota.

[¶ 59.] Despite Plaintiffs' failure to focus on material issues, the record is clear that only four class action antitrust suits have been brought in South Dakota between 1996 and 2004, two in federal district court and two in Hughes County. Given the paucity of such suits in the area and the use of out-of-state counsel in those cases, it is clear that the trial court was aware such expertise is not generally available in South Dakota. Therefore we cannot conclude that the trial court abused its discretion when it did not limit Plaintiffs' out-of-state counsel to prevailing local rates.

[¶ 60.] **3. Whether the circuit court erred when it applied a multiplier of two to the fees of Plaintiffs' counsel.**

■■■■ [¶ 61.] The lodestar amount normally provides full and reasonable compensation for counsel who produces excellent results. *Blum*, 465 U.S. at 901, 104 S.Ct. at 1550, 79 L.Ed.2d 891; *Alvine v. Mercedes–Benz of North Am.*, 2001 SD 3, ¶ 25, 620 N.W.2d 608, 613 (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d 40). However, an enhancement to a fee award may be justified where "exceptional success" has been attained by prevailing counsel. *Id.* (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 52). Courts that have considered the issue in class action settlements note that a lodestar multiplier reflects such factors as the results obtained, the risks involved, the contingent nature of the fee, quality of the work performed, and public policy considerations.[23] *Osher v. SCA Realty I, Inc.*, 945 F.Supp. 298, 308

---

**23.** Federal case law is clear that when determining whether the application of a multiplier is warranted, it is critical that the trial court not back into a multiplier by first calculating total fees using the percentage of the benefit method, and then attempt to justify a multiplier in order to achieve the targeted percentage. *In re Bausch & Lomb, Inc. Securities Litigation*, 183 F.R.D. 78, 89 (W.D.N.Y. 1998) (citing *Wallace on Behalf of Northeast Utilities v. Fox*, 7 F.Supp.2d 132, 139 (D.Conn.1998)).

(D.D.C.1996) (holding (1) the complexity and magnitude of counsel's task; (2) the quality of counsel's representation; (3) the results achieved by counsel; and (4) public policy considerations may be examined when considering a multiplier); *Kronfeld v. Transworld Airlines, Inc.*, 129 F.R.D. 598, 607–08 (S.D.N.Y.1990) (holding the risk of litigation, the benefit conferred on the class, the quality of the work performed and the complexity of the case may support the use of a multiplier); *In re WICAT Sec. Litig.*, 671 F.Supp. at 739–741 (holding the magnitude and complexity of the litigation, the quality of the representation, the contingent nature of the engagement and the risk of nonpayment, and public policy considerations are relevant to the use of a multiplier). However calculated or justified, the fee applicant bears the burden of showing that an enhancement is necessary to provide fair and reasonable compensation. *Blum*, 465 U.S. at 898, 104 S.Ct. at 1548, 79 L.Ed.2d 891.

[¶ 62.] We address three of the factors as relevant to the multiplier analysis for purposes of this case: risks involved, public policy considerations, and exceptional success/results obtained. That is not to say that the quality of the work performed is not a relevant factor, but rather that it is reflected in the lodestar figure by virtue of the high hourly rates paid for the considerable expertise of the out-of-state firms in this type of litigation.

**Risks Involved**

[¶ 63.] Litigation risk must be evaluated at the time the case is filed. *Goldberg*, 209 F.3d at 55 (citing *DiFilippo v. Morizio*, 759 F.2d, 231, 234 (2nd Cir. 1985); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3rd Cir.1984)). The greater the probability of success as viewed from the outset of the litigation of either a settlement or a victory on the merits, the less risk should be considered as justification for enhancing the lodestar. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2nd Cir.1974). Whether governmental or civil action has already been instituted or successfully concluded against the defendant are relevant considerations when determining the risk factor. *Id.*

[¶ 64.] The original three cases that comprise this consolidated class action were filed in March 2000. The instant case had the benefit of the District Court for the District of Columbia's 412 findings of fact, as well as its holding that Microsoft improperly maintained a monopoly in the operating systems market. The language in Plaintiffs' complaint was substantially borrowed from other class action suits against Microsoft. The case also benefited from the consolidated discovery, eliminating the need for local and lead counsel to take depositions. Most importantly, the risk associated with Microsoft's challenge to class certification may not be considered as a risk-enhancing factor, as case law requires that risk be assessed at the time of filing. Given the above mentioned factors, it is not an overstatement to say that the South Dakota suit was a tag along action that posed at best moderate risk at the outset. Therefore, risk is not a factor weighing in favor of a multiplier.

**Public Policy Considerations**

[¶ 65.] There must be some reasonable relationship between the attorney fee award and the amount of recovery generated as a result of the attorney's work. *Tanenbaum v. Agri–Capital, Inc.*, 885 F.2d 464, 471 (8th Cir.1989) (citation omitted); *Swanson v. American Consumer Indus., Inc.*, 517 F.2d 555, 563 (7th Cir.1975); *Twentieth Century–Fox Film Corp. v. Brookside Theatre Corp.*, 194 F.2d 846, 859 (8th Cir.1952); *Copeland v. Marshall*, 641 F.2d 880, 908 (D.C.Cir.1980) (MacKinnon, J., concurring). Judge Deck-

er said it best in *State of Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221, 224 (N.D.Ill.1972):

> some attempt must be made by the court to suit the award of fees to the performance of individual counsel in light of the size of the settlement. Otherwise, the attorneys who are taking advantage of class actions to obtain lucrative fees will find themselves vulnerable to the criticism expressed in the Italian proverb, "A lawsuit is a fruit tree planted in a lawyer's garden."

[¶ 66.] An award of $2,064,000 in attorney fees achieved via a multiplier of two has no reasonable relationship to the $466,000 in benefits made available to Class Members as a result of the efforts of class counsel. The addition of the *cy pres* trust value of $4,431,750 still fails to generate a reasonable relationship between the attorney fee award and the value of the voucher settlement.[24] A fee award of almost fifty-percent of the value of the bene-fits generated by the class action would represent a windfall rather than a reasonable award of attorney fees.

[¶ 67.] The dissent focuses on the trial court's examination of other settlements reached by Microsoft to support its assertion that there was a reasonable relationship between the fees requested in South Dakota and the benefits generated for Class Members. However, the numbers presented in the dissent's writing only give part of the picture. Class action settlements in California, Montana and West Virginia are used by the dissent for comparison to support its assertion that the fees awarded in South Dakota bear a reasonable and similar relationship to fees awarded in other jurisdictions. The class action settlements of Tennessee, Florida and North Dakota are also included below for further illustration, as the information for all six jurisdictions was a part of the record.

| State | Face Value | Total Fees | % of face value |
|-------|-----------|-----------|-----------------|
| California | 1.1 billion | 101.000 million | 9.17 |
| Florida | 202.80 million | 16.874 million | 8.32 |
| Montana | 12.30 million | 1.476 million | 12.00 |
| North Dakota | 9.00 million | 1.080 million | 12.00 |
| Tennessee | 64.00 million | 8.000 million | 12.50 |
| West Virginia | 21.00 million | 4.125 million | 19.62 |
| South Dakota | 9.33 million | 2.064 million[25] | 22.12 |

It is evident that the fees awarded in this case are the highest as a percentage of the total face value of any of the Microsoft cases the trial court used for comparison. Once the face value of $9.33 million is discounted to $4.9 million, attorney fees represent 46.49 of the actual benefits generated by the litigation. As such, the fees are more in the nature of a windfall rather than reflecting the "performance of indi-

24. While Microsoft did not dispute the inclusion of the *cy pres* trust in the total value of the settlement for purposes of value of the benefit cross-check, it is important to note that Microsoft insisted on the inclusion of the *cy pres* trust in the South Dakota settlement as it did in every jurisdiction in which a settlement was reached.

25. The $2.064 million figure represents the amount of attorney fees awarded by the trial court and appealed by Microsoft.

vidual counsel in light of the size of the settlement."

## Exceptional Success

[¶ 68.] We have not had occasion to consider how and when "exceptional success" has been achieved such that a multiplier may be applied to the lodestar in order to provide fair and reasonable compensation. Those courts that have reviewed settlements in which vouchers rather than monetary compensation have been awarded to class member, focused on the value of the benefits that accrued to the Class Members as a result of the attorney's efforts as the starting point for determining whether the results obtained warrant application of a multiplier. *In re Excess Value Ins. Coverage Litig.*, 2004 WL 1724980, *16 (S.D.N.Y.2004); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F.Supp.2d 320, 321(D.Me.2005); *O'Keefe v. Mercedes–Benz USA, LLC*, 214 F.R.D. 266, 304–5 (E.D.Pa.2003); *Buchet v. ITT Consumer Fin. Corp.*, 845 F.Supp. 684, 693 (D.Minn. 1994); and *Barnhill v. Florida Microsoft Anti-Trust Litigation*, 905 So.2d 195, 200 (Fla.Dist.Ct.App.2005).

[¶ 69.] The value of the benefit to Class Members in a voucher settlement has been calculated under two different sets of circumstances. When the fee application has been opposed by the defendant, a majority of those jurisdictions reviewed have not calculated the value of the benefit to Class Members using the face value of the voucher settlement. *See In re Excess Value Insurance Coverage Litigation*, 2004 WL 1724980 at *16; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F.Supp.2d at 321; *O'Keefe*, 214 F.R.D. at 304; and *Buchet*, 845 F.Supp. at 693. Instead, the value has been calculated based either on the number of vouchers that are actually redeemed, *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 370 F.Supp.2d at 321, or number of vouchers claimed by Class Members. *In re Excess Value Insurance Coverage Litigation*, 2004 WL 1724980 at *16. When the fee application is unopposed by the defendant, the full face value of the voucher settlement has been used to justify the multiplier. *Barnhill*, 905 So.2d at 200.

[¶ 70.] In the instant case, Defendant opposed the fee application. As such, we are persuaded that the full face value of the voucher settlement is not the proper amount to use in determining the benefit to Class Members. The valuation of benefit to Class Members should reflect the actual benefits received, and not hypothetical benefits that will never accrue. The trial court, lacking precedent in the area, erred when it used the full face value of $9.33 million to evaluate the result of the litigation, and overestimated the benefit to Class Members. In this case, the direct benefit to Class Members is no more than $466,500 in vouchers.

[¶ 71.] Class counsel did create identifiable value for Class Members, but that value is less than one-twentieth of the potential face value of the settlement negotiated, and less than one-fourth of the $2.1 million in attorney fees ultimately awarded by the trial court. The low claims rate of less than five percent may be the result of a variety of factors, including a misunderstanding of the eligibility criteria or the claims process, or a perception that a twelve or five dollar voucher was insignificant in comparison to the cost of a new computer system, hardware component or software package. Whatever the reason, a twelve or five dollar voucher was not a substantial enough benefit to motivate a significant number of Class Members to overcome these barriers. Moreover, none came forward to support the concept that

their individual voucher constituted an "exceptional success."

[¶ 72.] While the benefits of the *cy pres* trust will not accrue directly to Class Members, Microsoft did not oppose the inclusion of its value of $4,431,750 in vouchers in determining the value of the settlement. Therefore, the value of the benefit generated by the litigation should have been set at $4.9 million, rather than the $9.33 million figure used by the trial court.[26]

[¶ 73.] The value conferred on the Class Members and on the 219 schools benefited by the work of class counsel did not result in "exceptional success" in terms of the benefit to Class Members. Instead, the benefit was relatively modest given that the relief requested by Plaintiffs in their complaint, the difference between the monopoly price and the competitive price,

had little perceived benefit to the majority of Class Members.

[¶ 74.] Our holding in *Alvine*, 2001 SD 3, ¶ 25, 620 N.W.2d at 613, makes it clear that exceptional success is a threshold that must be met before a multiplier or enhancement may be considered. In the instant case, Plaintiffs have failed to meet the threshold finding of exceptional success. In addition, the risk analysis and public policy considerations do not support the use of a multiplier. The trial court is reversed as to this issue. On remand the trial court should not apply a multiplier given the lack of "exceptional success."

[¶ 75.] **4. Whether the circuit court erred when it applied the multiplier of two to post-settlement work of Plaintiffs' counsel.**

[¶ 76.] Given our holding in Issue 3, it is not necessary to address the merits of this issue, other than to note that a multi-

---

**26.** The dissent disputes the Court's use of the five percent redemption figure to arrive at the benefit to Class Members figure of $4.9 million as part of the evaluation of whether "exceptional success" was achieved by Plaintiffs. The dissent states: "the majority opinion assesses the value of the benefit by assuming that five percent of the vouchers will be redeemed." *See infra* ¶ 92. However, what the dissent ignores is that *less than five percent* of the vouchers that were available to Class Members were applied for by the close of the claims period on October 15, 2004. Therefore, because the number of vouchers that can be redeemed by Class Members by the redemption date of October 24, 2008, cannot exceed the total number claimed, the final redemption value will be less than five percent of the total amount available.

The five percent figure errors on the side of generosity. At the time of the fee hearing on June 14, 2004, the point in time when the trial court was asked to evaluate whether exceptional success had been achieved, only eleven volume licensee companies and 521 non-volume licensees had applied for vouchers. This, despite the fact that in order to notify class members of their eligibility and

the claims process, 30,923 class members were contacted by United States mail; 29,806 class members were contacted by e-mail; and notices were published in twelve South Dakota newspapers with a combined daily circulation of 158,111 and combined Sunday circulation of 133,409 readers.

The dissent then disputes that the trial court actually used the $9.33 million figure when evaluating the success of the settlement agreement. However, on page 15 of the Findings of Facts and Conclusions of Law, the trial court notes under the subtitle "L. Favorable comparison of fee and settlement," that it uses the $9.33 million face value. While it is true that the trial court does not restate the figure in section 17 when it concludes that "this is a 'rare and exceptional case' that warrants a multiplier or enhancement of two[,]" $9.33 million is the only figure the trial court uses to evaluate the benefit received by Class Members in comparison to attorney fees requested. The trial court goes on to say in subsection 19 "Based on the factors and authorities discussed in the preceding numbered paragraph, ...", thereby incorporating the $9.33 figure into its multiplier analysis.

plier is not applicable to this case for either pre-settlement or post-settlement work given the lack of "exceptional success." Therefore, we reverse as to Issue 4.

[¶ 77.] **5. Whether an award of attorney fees to lawyers in an antitrust class action is disproportionate and inconsistent with South Dakota law when the award greatly exceeds the amount recovered on behalf of the class.**

[¶ 78.] It is not necessary to reach Issue 5 given our holdings in Issues 1 through 4, as the amount of attorney fees must be recalculated by the trial court on remand.

[¶ 79.] **6. Whether Plaintiffs' counsel are entitled to a fee award of no more than $390,000.**

[¶ 80.] We will not address the merits of this issue given that the Issues 1 and 2 are remanded to the trial court for recalculation of the lodestar amount, and Issues 3 and 4 are reversed.

[¶ 81.] KONENKAMP, Justice, and MILLER, Retired Justice, concur.

[¶ 82.] MEIERHENRY, Justice, and TUCKER, Circuit Court Judge, dissent.

[¶ 83.] TUCKER, Circuit Court Judge, sitting for SABERS, Justice, disqualified.

[¶ 84.] MILLER, Retired Justice sitting for ZINTER, Justice, disqualified.

MEIERHENRY, Justice (dissenting).

[¶ 85.] I dissent because there has been no showing that the trial court abused its discretion. When reviewing an attorney fee award, our determination is not "whether we would have made the same ruling, but whether 'a judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.'" *DeVries v.*

*DeVries,* 519 N.W.2d 73, 75 (S.D.1994) (citation omitted). Here, the majority opinion disregards the deferential standard of review and substitutes its ruling for that of the trial court.

[¶ 86.] Even though our prior class action suits give little guidance on how to calculate attorney fees, they clearly set forth the standard of review, which is, abuse of discretion—the most deferential standard of review. As we recently reiterated in *Wald v. Stanley,*

"Abuse of discretion is the most deferential standard of review available with the exception of no review at all." "We determine that an abuse of discretion occurred only if no judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion." An abuse of discretion is "a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable."

2005 SD 112, ¶ 8, 706 N.W.2d 626, 629 (citations omitted).

*Allocation of Time to South Dakota Case*

[¶ 87.] Despite the lack of an itemized statement for every service rendered in this litigation, the trial court did not "guess" at the amount of services. Only after a thorough analysis did the trial court accept the twenty-percent allocation for South Dakota's share of the Microsoft litigation. The majority claims that without time charges specifically allocated to the South Dakota litigation, it is "almost impossible to make a conscientious and detailed inquiry into the validity of the representation." *See supra* ¶ 35. To the contrary, the trial court conscientiously reviewed the time devoted to the South Dakota case. Judge Wilbur specifically found that the twenty percent allocation was rea-

sonable. She based the percentage on counsel's involvement as lead counsel in four state actions and the federal multidistrict litigation. Her finding was as follows:

Mr. Barnow is lead class counsel in four states (South Dakota, Kansas, Wisconsin and Michigan), has had minimal involvement in four other states (North Carolina, West Virginia, Minnesota and Maine) and is the state lead counsel in the [multidistrict litigation] proceedings. He was directly involved in the coordinated discovery efforts that provided substantial benefits to both the South Dakota Settlement Class and Microsoft. He was also admitted *pro hac vice* in this case and was appointed and served first as Class counsel and then as Settlement Class counsel.

Further, coordination with other state actions was required by two pretrial orders that Microsoft supported.

[¶ 88.] The majority determines that only one-eighth of the fees allocated to the South Dakota litigation should have been allowed since the South Dakota litigation was one of eight cases in which the plaintiffs' attorneys served as class counsel. The majority does so, however, without citing any evidence in the record which indicates that the trial court's determination was clearly erroneous. By finding that one-eighth is a more appropriate allocation than one-fifth, the majority is merely substituting its ruling for that of the trial court. The trial court's finding of a twenty percent allocation was not unreasonable.

*Hourly Rate for Local Counsel*

[¶ 89.] The majority opinion also questions the fees approved for local counsel because "no evidence was provided by Plaintiffs in the record, other than their billing statements, to support a finding that the rates requested were the prevailing local rates in South Dakota for this type of litigation." *See supra* ¶ 47. The evidence in the record, however, shows that the trial court was faced with conflicting evidence. The billing statements show that Plaintiffs' local attorneys charged between $100 and $300 per hour. Plaintiffs' local counsel Moreno, who charged $300 per hour, also submitted an affidavit supporting his rate. Moreno stated that "[t]he principle focus of [his] practice is, and has been for several years, in the area of class action litigation." Further, Plaintiffs submitted evidence which indicated that a local attorney received $220 per hour as local counsel for a prescription drug indirect purchaser class action for work performed from 1999 to 2001.

[¶ 90.] In opposition to Plaintiff's request for fees, Microsoft submitted the affidavit of Robert C. Riter, Jr., a local attorney. According to Riter, the prevailing hourly rate for attorneys in the area with experience similar to that of Plaintiffs' local attorneys was $150 to $175 per hour, whereas attorneys with specialized experience would charge $250 to $300 per hour. Riter, however, "[did] not believe that any of [Plaintiffs'] local attorneys principally practice in the specialized area of class action litigation."

[¶ 91.] The trial court, in its discretion, resolved this dispute in favor of Plaintiffs. It found that "[t]he fees requested by Plaintiffs' counsel, while perhaps higher than the rates generally charged in South Dakota for some types of legal services, are not unreasonable in a case of this nature, especially when compared to what Microsoft paid its own attorneys for work in the same case." Trial courts regularly determine what constitutes reasonable attorney's fees in a wide variety of cases. Here the trial court had the opportunity to observe the work of plaintiffs' local counsel in this "rare and exceptional case" and was in the best position to evaluate the attor-

ney's expertise. Although additional evidence of prevailing rates would have bolstered plaintiffs' fee request, the trial court's determination was within the range outlined in the affidavit submitted by Microsoft. The award is supported by the record and not "outside the range of permissible choices." Further, the use of Microsoft's attorney's fees merely as a cross check for Plaintiffs' local and out-of-state attorney's fees should not constitute an abuse of discretion.

*Multiplier of Two to Lodestar*

[¶ 92.] In determining that the trial court erroneously applied a multiplier to the lodestar calculation, the majority opinion again substitutes its judgment for that of the trial court. The majority asserts that the settlement here achieved no "exceptional success," while the trial court found otherwise. In reaching its conclusion, the majority assesses the value of the benefit by assuming that five percent of the vouchers will be redeemed. The majority suggests that the trial court made its determination based on the $9.33 million face value of the voucher settlement. The trial court's findings concerning the multiplier, however, never mention $9.33 million. Rather, the trial court considered several factors and found that this was a "rare and exceptional case" meriting a multiplier of two. The trial court found as follows:

17. Having considered the arguments raised by counsel for both parties for and against a multiplier, the Court finds that this is a *"rare and exceptional case "* that warrants a multiplier or enhancement of two.

18. The Memoranda Microsoft submitted and the arguments it made at the Final Approval hearing support the Court's determination that this case, and the settlement reached in it, were truly exceptional and are in

a class by themselves; when measured against other civil cases filed in South Dakota state courts over the years. The fact that Plaintiffs typically prevail in a small percentage of private antitrust cases that proceed to judgment, further underscores the exceptional nature of the present case and the multi-million dollar settlement that Plaintiffs' counsel were able to negotiate with Microsoft.

19. Based on the factors and authorities discussed in the preceding numbered paragraph, and those referred to herein and in its Decision, the Court finds that a multiplier of two is appropriate in this case. Plaintiffs' counsel's efforts have resulted in substantial success. Counsel's quality of representation has been superior and the results they have obtained are exceptional. Counsel have pursued the case vigorously but efficiently and have saved themselves, as well as Microsoft, thousands of dollars in litigation costs. The results achieved are the product of creative lawyering. Counsel have faced and had to overcome novel and difficult questions and have displayed exceptional skill in presenting the issues and their arguments. They have endured the risk of not being compensated at all and the attendant delay in receiving payment for their services. Because of the enormous amount of time they spent working on the case, counsel have been precluded or at least limited in their ability to take on other employment. And, time limitations imposed by court-ordered deadlines, hearings and other circumstances have affected counsel's other work. Finally, pursuing and

ultimately obtaining a successful settlement against a multi-billion dollar Fortune 500 company has been a tall task legally and economically, and has created obvious disincentives for companies, like Microsoft, to seek out representation from Plaintiffs' counsel for future matters.

(emphasis added). The trial court's decision is not clearly against reason and evidence.

### Reasonableness of Fees

[¶ 93.] Most importantly, the trial court recognized that no matter how attorney's fees are calculated, they must be reasonable. The majority opinion completely disregards the trial court's complete and thorough analysis of the factors set forth in *Crisman* and *Kelley*. Further, the majority fails to consider determinations reached by other courts on this exact issue. As the trial court noted,

The recent California decision in *Microsoft I–V Cases,* J.C.C.P. No. 4106 (Cal.Super.Ct. Sept. 9, 2004) clearly supports the $2.064 million attorney fee award in this case. There, the California court, in awarding $101 million in fees based on a multiplier of two, held that the expenditure of more than $51 million in attorney time was reasonable in obtaining the voucher settlement....

Significantly, in a number of other state cases, Microsoft agreed to pay attorney fees of between 12% and 20% of the *face value* of the voucher settlement. In the Montana case, Microsoft agreed to pay $1.476 million in fees and costs, when, unlike the case at bar, there were no contested hearings or appeals. Moreover, in West Virginia, Microsoft agreed to pay $4.125 million in fees and costs even though the legal work there was far less than occurred here.

(emphasis added). In light of the analysis undertaken by the trial court and the decisions rendered by other courts in other jurisdictions, I question how the majority can find the trial court's award unreasonable. This should not be a de novo review. "[A] judicial mind, in view of the law and the circumstances" in this case, "could reasonably have reached [the] conclusion" arrived at by the trial court. *DeVries,* 519 N.W.2d at 75 (citation omitted). The trial court did not abuse its discretion. I would affirm.

[¶ 94.] TUCKER, Circuit Judge, joins this dissent.